**COLLECT AMERICA, LTD.**
**LICENSE AGREEMENT**

|  |  |
|---|---|
| **Licensee:** | **The Law Office of Curtis O. Barnes, P.C.** |
| **Location:** | **390 W. Cerritos Ave.** |
|  | **Anaheim, CA 92805** |
| **Date:** | **March 13, 2003** |



**COLLECT AMERICA, LTD.**
**LICENSE AGREEMENT**
**TABLE OF CONTENTS**

1.  DEFINITIONS ............................................................................................................ 1

2.  GRANT OF LICENSE AND LICENSED LOCATION ....................................... 2
    2.1.  Grant of License ........................................................................................ 2
    2.2.  Licensed Location ...................................................................................... 2
    2.3.  Market and Customers .............................................................................. 3
    2.4.  Existing Business ...................................................................................... 3
    2.5.  Reservation of Rights ................................................................................ 3
    2.6.  Commencement of Operations .................................................................. 3
    2.7.  Extension of Time ..................................................................................... 3
    2.8.  Pre-Opening Obligations .......................................................................... 4

3.  MARKS AND PROPRIETARY INTERESTS ..................................................... 4
    3.1.  Marks ......................................................................................................... 4
    3.2.  Use of Marks ............................................................................................. 4
    3.3.  Licensed System ....................................................................................... 4
    3.4.  Copyrights ................................................................................................. 4
    3.5.  Infringement .............................................................................................. 4
    3.6.  Licensee's Business Name ........................................................................ 5
    3.7.  Change of Marks ....................................................................................... 5

4.  INITIAL LICENSE FEE ....................................................................................... 5
    4.1.  Initial License Fee ..................................................................................... 5

5.  CONTINUING ROYALTY FEE ........................................................................... 5
    5.1.  Continuing Royalty Fee ............................................................................ 5
    5.2.  Payments of CRF to Licensor ................................................................... 5

6.  OTHER FEES ......................................................................................................... 6
    6.1.  Training Fee .............................................................................................. 6
    6.2.  Consulting Fee .......................................................................................... 6
    6.3.  Late or Insufficient Payments .................................................................. 6
    6.4   Bad Check Charges on Collection Accounts ............................................ 6

7.  OPERATIONS AND TRAINING MANUAL ....................................................... 6
    7.1.  Operations and Training Manual .............................................................. 6
    7.2.  Confidentiality of O&T Manual ............................................................... 6
    7.3.  Changes to O&T Manual .......................................................................... 7

8.  LICENSEE'S OPERATIONAL COVENANTS .................................................... 7
    8.1.  Employees ................................................................................................. 7

| | 8.2. | Maintenance and Upkeep | 7 |
|---|---|---|---|
| | 8.3. | Compliance with Laws | 7 |
| | 8.4. | Management | 7 |
| | 8.5. | Payments to Creditors | 8 |
| | 8.6. | Software License Agreement | 8 |
| | 8.7. | Advertising | 8 |
| | 8.8. | Working Capital | 8 |
| | 8.9. | Statement of Ownership | 9 |
| 9. | | LICENSOR'S OBLIGATIONS | 9 |
| | 9.1. | Initial Training Program | 9 |
| | 9.2. | On-Site Assistance | 9 |
| | 9.3. | Regional Meetings | 9 |
| | 9.4. | On-Going Assistance | 10 |
| | 9.5. | Consultations | 10 |
| | 9.6. | Data Center | 10 |
| | 9.7. | Software | 10 |
| 10. | | REFERRAL OF CAOD BY LICENSOR | 11 |
| | 10.1. | Referral of CAOD | 11 |
| | 10.2. | Acceptance of CAOD | 11 |
| | 10.3. | Collection of CAOD | 11 |
| | 10.4. | Deposit of CAOD Funds | 11 |
| | 10.5. | Licensee's Contingency Fees | 12 |
| | 10.6. | Return of CAOD to Licensor | 12 |
| 11. | | COVENANTS AND CONFIDENTIALITY | 12 |
| | 11.1. | Noncompetition During Term | 12 |
| | 11.2. | Post-Termination Covenant Not to Compete | 13 |
| | 11.3. | No Diversion | 13 |
| | 11.4. | Confidential Information | 14 |
| | 11.5. | Confidentiality Agreements | 14 |
| | 11.6. | Invalidity of Covenants | 14 |
| 12. | | TERM AND RENEWAL | 14 |
| | 12.1. | Term | 14 |
| | 12.2. | Renewal | 14 |
| | 12.3. | Exercise of Option to Renew | 15 |
| | 12.4. | Conditions of Refusal | 15 |
| 13. | | QUALITY CONTROL | 15 |
| | 13.1. | Standards and Specifications | 15 |
| | 13.2. | Pricing | 15 |
| | 13.3. | Changes in Standards and Specifications | 15 |
| | 13.4. | Restrictions on Services and Materials | 15 |
| | 13.5. | Approved Suppliers | 16 |

13.6. Inspection ....................................................................................... 16

14. INSURANCE ................................................................................ 16
14.1. Insurance Coverage ............................................................ 16
14.2. Policy Provisions ............................................................... 16
14.3. Proof of Insurance ............................................................. 16
14.4. Additional Coverage .......................................................... 17

15. INDEPENDENT CONTRACTOR; INDEMNIFICATION .......... 17
15.1. Business Relationship ........................................................ 17
15.2. Indemnification ................................................................. 17
15.3. Notice ............................................................................... 17

16. REPORTS, FINANCIAL STATEMENTS AND AUDIT RIGHTS ...... 18
16.1. Books and Records ............................................................ 18
16.2. Licensee Reports ............................................................... 18
16.3. Audit ................................................................................. 18

17. ASSIGNMENT ............................................................................ 18
17.1. Assignment by Licensor .................................................... 18
17.2. Assignment by Licensee .................................................... 18
17.3. Pre-Conditions to Licensee's Assignment ......................... 18
17.4. Licensor's Approval of Transfer ........................................ 19
17.5. Licensee's Death or Disability ........................................... 19

18. DEFAULT AND TERMINATION ................................................ 20
18.1. Termination By Licensor ................................................... 20
18.2. Obligations of Licensee Upon Termination or Expiration .... 21
18.3 Survival of Obligations ...................................................... 22
18.4. Cross Default .................................................................... 22
18.5. State Law ......................................................................... 22

19. OPTION TO PURCHASE ADDITIONAL LICENSE ..................... 22
19.1. Option to Purchase Additional License .............................. 22

20. NOTICES .................................................................................... 22
20.1. Notices ............................................................................. 22

21 ARBITRATION ........................................................................... 22
21.1. Arbitration ........................................................................ 23
21.2 Arbitration Award ............................................................. 23
21.3. Limitations on Proceedings ............................................... 23
21.4. Location of Arbitration ..................................................... 23
21.5. Injunctive Relief ............................................................... 23
21.6. No Withholding of Payment .............................................. 24
21.7. Attorneys' Fees and Costs ................................................. 24

22.    MISCELLANEOUS PROVISIONS..................................................................... 24
    22.1.    Invalidity .................................................................................... 24
    22.2.    Cumulative Effect ........................................................................ 24
    22.3.    Modification................................................................................ 24
    22.4.    Governing Law/Consent to Jurisdiction ....................................... 24
    22.5.    Entire Agreement ......................................................................... 25
    22.6.    Force Majeure .............................................................................. 25
    22.7.    Waiver ......................................................................................... 25
    22.8.    Effective Date .............................................................................. 25
    22.9.    Captions ...................................................................................... 25
    22.10.   Construction ................................................................................ 25
    22.11   Acknowledgment ......................................................................... 26
    22.12   Background Check ........................................................................ 26

## EXHIBITS

I.      Location Addendum
II.     Statement of Ownership
III.    Guaranty and Assumption of Licensee's Obligations
IV.     Supervising Attorney Addendum
V.      Software Licensing Agreement
VI.     Contingency Fee Agreement

# COLLECT AMERICA, LTD.
## LICENSE AGREEMENT

This License Agreement (the "Agreement") is made and entered into this 13th day of March, 2003 by and between Collect America, Ltd., a Delaware Corporation, hereinafter referred to as the "Licensor" and, The Law Office of Curtis O. Barnes, P.C., located at 390 W. Cerritos Ave., Anaheim, CA 92805, hereinafter referred to as the "Licensee".

1.        RECITALS

A.      Licensor, using its service mark  (**"COLLECT AMERICA**®") and related design, and other trademarks, service marks and trade names specifically associated with Licensor ("Marks"), has developed a distinctive system to market and service debt collection activities ("System") through licensed offices (**"COLLECT AMERICA** Business") which provide collection services via a centralized computer system and communications network ("Network") utilizing the proprietary software of Licensor ("Software") and Licensor's Marks.

B.      Licensor grants the non-exclusive rights to use its System, Network, Software and Marks (collectively referred to herein as the **"COLLECT AMERICA** Program") to qualified licensees.

C.      Licensee desires to obtain a license permitting Licensee to use the **COLLECT AMERICA** Program to develop and enhance Licensee's debt collection activities.

The parties therefore agree as follows:

## 1. DEFINITIONS

**1.1.      COLLECT AMERICA Data Center** is Licensor's data processing infrastructure used to host the **COLLECT AMERICA** Network composed of Licensor and Licensees.

**1.2.      COLLECT AMERICA Originated Debt ("CAOD")** is debt originated by Licensor and placed with a Licensee.

**1.3.      Continuing Royalty Fee ("CRF")** is the monthly fee paid by Licensee for use of the **COLLECT AMERICA** Program and which is described in detail in Section 5 of this Agreement.

**1.4.      Gross Collections** shall mean any sum of money collected by Licensee that is credited to a debtor's account and upon which Licensee is entitled to charge a fee.  Gross Collections are not affected by the method or place of payment.

**1.5.      Licensee** is an individual or a business entity (including, without limitation, a professional corporation, a partnership or a limited liability company) that may or may not be a law firm, and has executed, and agrees to the terms of, the Transaction Documents as defined



License Agreement (06/02)
Licensor Initial _____
Licensee Initial _____
Supervising Attorney _____

1

herein. All requirements and obligations of the Licensee, other than ownership, as stated in the Transaction Documents shall be applicable to the Supervising Attorney, unless stated otherwise.

**1.5.1.   Licensed Entity** is a Licensee that is a business entity.

**1.6.   Licensed Location** is the physical location at which Licensee will utilize the **COLLECT AMERICA** Program.

**1.7.   Placement Fee** is the fee that Licensor may charge in addition to the CRF. The Placement Fee will be deducted prior to the fee disclosed to Licensee in the Accounts Available for Distribution Form.

**1.8.   STARS**© is the name of the Licensor's copyrighted and proprietary debt collection Software which Licensee will be authorized to use pursuant to a Software License Agreement.

**1.9.   Supervising Attorney** is the licensed attorney designated by the Licensee, with the approval of Licensor, to conduct and be responsible for the on-site management and supervision of the **COLLECT AMERICA** Business. The designation of a Supervising Attorney is mandatory and the Supervising Attorney shall be subject to all the terms and conditions of the Transaction Documents. All requirements and obligations of the Licensee, other than ownership, as stated in the Transaction Documents shall be applicable to the Supervising Attorney, unless stated otherwise.

**1.10.   Threshold Number** is the maximum number of **COLLECT AMERICA** Businesses which will be licensed in each state.

**1.11   Transaction Documents** means this Agreement, any guarantees of this Agreement, the Software License Agreement, Contingency Fee Agreements, Background Questionnaire and Master Accounts Available for Distribution Agreements, and with respect to each of such documents, all addenda, exhibits and schedules thereto.

## 2.  GRANT OF LICENSE AND LICENSED LOCATION

**2.1.   Grant of License.** Licensor grants to Licensee, and Licensee accepts from Licensor, the non-exclusive right to use the **COLLECT AMERICA** Program in the course of conducting collection activities ("Licensed Business") at the Licensed Location described in Section 2.2 below. Licensee agrees to use the **COLLECT AMERICA** Program as it may be changed, improved and further developed from time to time, only in accordance with the terms and conditions of this Agreement.

**2.2.   Licensed Location.** Licensee shall have the right to operate one **COLLECT AMERICA** Business at the address and location which shall be set forth in the Addendum which is attached hereto as Exhibit I and incorporated by this reference ("Licensed Location").



License Agreement (06/05)
Licensor Initial
Licensee Initial
Supervising Attorney

2

The Licensed Location may not be relocated without the prior written approval of Licensor, which approval shall not be unreasonably withheld.

**2.3.** **Market and Customers.** Licensee acknowledges that the operation of a **COLLECT AMERICA** Business at the Licensed Location does not grant Licensee the exclusive right to any particular market or clients. All **COLLECT AMERICA** licensees are free to advertise and solicit clients from and in any geographic area. Similarly, Licensor is free to advertise and solicit clients from and in any geographic area.

**2.4.** **Existing Business.** If Licensee is presently engaged in the practice of law which includes areas of law other than debt collection ("Existing Business"), Licensee may continue to operate the Existing Business at the Licensed Location, in accordance with its present standards of professionalism and ethical business practices, during the term of this Agreement, provided that the Licensed Business is maintained as a separate business from the Existing Business for accounting and record keeping purposes. Licensor and Licensee acknowledge and agree that either shall have the right to enter into exclusive representation agreements with their respective clients.

**2.5.** **Reservation of Rights.** Licensor reserves the rights, among others: (a) to use and to license others to use, the Marks and **COLLECT AMERICA** Program for the operation of a **COLLECT AMERICA** Business at any location other than at the Licensed Location, provided however, that Licensor shall only operate or license **COLLECT AMERICA** Businesses up to the Threshold Number listed in the Addendum for the state in which Licensee's **COLLECT AMERICA** Business will be located; (b) to use and license the use of other proprietary marks or methods in the sale of services similar to those which Licensee will sell, whether in alternative channels of distribution or in connection with the operation of debt collection businesses, which are the same as, or similar to, or different from **COLLECT AMERICA** Businesses at any location; and (c) to license a modified version of the Software in any geographic area as Licensor, in its sole discretion, deems appropriate and necessary without regard to the number of **COLLECT AMERICA** Licensees in the area.

**2.6.** **Commencement of Operations.** Unless otherwise agreed in writing by Licensor and Licensee, Licensee shall establish its Licensed Location within ninety (90) days from the date of this Agreement and Licensee's operations shall commence as soon as Licensee has satisfactorily completed training.

**2.7.** **Extension of Time.** Licensor will extend, for a reasonable period, the time in which Licensee has to commence operating its Licensed Business providing: (a) factors beyond Licensee's reasonable control prevent Licensee from meeting this development schedule; (b) Licensee has made reasonable and continuing efforts to comply with such development obligations; and (c) Licensee submits a written request for an extension of time before the expiration of such ninety (90) period.



**2.8.    Pre-Opening Obligations.** Prior to the commencement of operations, Licensee will: (a) acquire the computer equipment and Network access required by Licensor; (b) have a dedicated data line installed at the Licensed Location by a supplier designated by Licensor; and (c) successfully complete the initial training program described in Section 9.1 below.

### 3. MARKS AND PROPRIETARY INTERESTS

**3.1.    Marks.** Licensor is the owner of the Marks. The use by Licensee of the Marks shall be limited to those uses authorized in this Agreement. Licensee agrees not to infringe upon, or permit others to infringe upon, Licensor's exclusive ownership rights in the Mark or claim any right to the goodwill associated therewith. It is understood that the success of the **COLLECT AMERICA** Program depends in part on the goodwill associated with the Marks.

**3.2.    Use of Marks.** The Marks, including the **COLLECT AMERICA** logo, may not be reproduced in any manner or color except as approved in writing by Licensor.

**3.3.    Licensed System.** Licensor owns and controls the distinctive plan for the establishment, operation and promotion of the **COLLECT AMERICA** business and all related licensed methods of doing business, defined in this Agreement as the "System", which includes, but is not limited to, all proprietary information concerning Licensor's business and the **COLLECT AMERICA** Businesses; sales methods; reports (electronic or printed); training techniques; all marketing research data and marketing plans; all information contained in Licensor's O&T Manual, and any other manual or nonpublic written information about Licensor, all of which constitute trade secrets of Licensor, and Licensee acknowledges that Licensor has valuable rights in and to such trade secrets. Licensee further acknowledges that it has not acquired any right, title or interest in the System except for the right to use the System in the operation of the **COLLECT AMERICA** Business as it is governed by this Agreement.

**3.4.    Copyrights.** Licensor is the owner of the Software in which it claims a copyright. Licensee is not acquiring any rights hereunder to make copies or replications of any of the Software or to prepare derivative works therefrom. Licensee agrees not to register or attempt to register such copyrights in any manner whatsoever.

**3.5.    Infringement.** Licensee shall promptly notify Licensor, in writing, of any possible infringement or illegal use of the Marks, the Software and/or any variation thereof by any other person, firm or corporation of which Licensee has knowledge. Licensee also agrees to notify Licensor promptly of any litigation instituted by any person, firm, corporation or governmental agency against Licensee or Licensor involving the Marks or Software. Licensee acknowledges that Licensor has complete discretion in determining whether to defend or prosecute such disputes. In the event Licensor undertakes the defense or prosecution of any litigation relating to the Marks or Software, Licensee agrees to execute any and all documents and to do such acts and things as may, in the opinion of counsel for Licensor, be reasonably necessary to carry out such defense or prosecution. Licensor shall be responsible for all costs of litigation arising out of any alleged violation unless such dispute arises out of Licensee's negligence or willful misconduct, in which case Licensee shall indemnify Licensor for all costs and damages resulting therefrom.

License Agreement (06/02)
Licensor Initial _____
Licensee Initial _____
Supervising Attorney _____



4

3.6.   **Licensee's Business Name**.   Licensee agrees not to register or attempt to register any service mark(s) in its own name or the name of any firm, person or corporation under Licensee's control which contain the words **"COLLECT AMERICA"**.   Licensee shall not use the words **"COLLECT AMERICA"** as part of its legal or corporate name.  Any filing, registration or use by Licensee of a trade name using the words **"COLLECT AMERICA"** shall be subject to the prior approval of Licensor.

3.7.   **Change of Marks**.   Licensor, in its reasonable and sole discretion, may determine it necessary to modify or discontinue the use of any of the Marks, or to develop additional or substitute marks.  In such an event, Licensee shall, within a reasonable time after receipt of written notice of such a modification or discontinuation from Licensor, take such action as may be necessary to comply with any modification, discontinuation, addition or substitution.   Licensee shall be responsible for all reasonable expenses associated with compliance to this provision.

## 4. INITIAL LICENSE FEE

4.1.   **Initial License Fee**.   Licensee shall pay to Licensor a nonrefundable license fee of Fifty Thousand Dollars ($50,000.00) upon execution of this Agreement.   Licensee acknowledges and agrees that this license fee represents payment for the initial grant of the right to use the **COLLECT AMERICA** Program and that Licensor has earned the license fee upon receipt thereof.

## 5. CONTINUING ROYALTY FEE

5.1.   **Continuing Royalty Fee**.   In consideration of the non-exclusive License for use of the **COLLECT AMERICA** Program, Licensee agrees to pay Licensor a monthly Continuing Royalty Fee ("CRF") equal to the greater of: (i) $850.00; or (ii) a sum equal to four percent (4%) of the Gross Collections on CAOD.   CRF shall begin to accrue upon commencement of operation of the Licensed Business.

5.2.   **Payments of CRF to Licensor**.   Licensor reserves the right, in its sole discretion, to off-set the CRF (or any other fees) due to Licensor against Licensee's "Contingency Fees," as described in the Contingency Fee Agreement to be entered into by Licensor and Licensee, or any other amounts owed to Licensee by Licensor.  If the CRF due Licensor exceeds any amounts owed to Licensee by Licensor, Licensor may, in its sole discretion, bill Licensee on or before the tenth (10th) day of each month for the net CRF due and owing at that time.  Licensee must remit the amount billed to Licensor on or before the fifteenth (15th) day of the same month.  Any CRF billed yet not paid by the fifteenth (15th) day of the month will be considered delinquent and a late fee of $25.00 per day will accrue thereon, commencing on the sixteenth (16th) day of the month, until received by Licensor.



## 6. OTHER FEES

**6.1.    Training Fee.**  If Licensee requests additional training in excess of that stated in Section 9.1, or if Licensor, in its sole discretion, determines that Licensee requires additional training, Licensee shall pay a training fee of $300.00 per day, per person ("Training Fee"). Additional Training Fees are due and payable two weeks prior to the commencement of training.

**6.2.    Consulting Fee.**  A consulting or programmer's fee of one hundred twenty five dollars ($125.00) per hour will be charged Licensee for any specific programming related to the Network which is required or requested by Licensee.  This fee must be paid in full upon completion of such required or requested consulting or programming.

**6.3.    Late or Insufficient Payments.**  All payments required under this Agreement which are not timely paid or paid in full, excluding the CRF payments, will bear interest from the date due until paid at the lesser of 18% per annum or the maximum amount allowed by applicable state law. Licensor also reserves the right, in its sole discretion, to set-off unpaid amounts and fees against any amounts owed to Licensee by Licensor.

**6.4.    Bad Check Charges on Collection Accounts.**  Licensee shall pay Licensor Five Dollars ($5.00) for each insufficient funds ("NSF") check Licensor receives from the collection accounts of Licensee.  Provided however, if the total amount of NSF checks exceeds five percent (5%) of Licensee's Gross Collections in any one month period, Licensee shall be required to pay Licensor Twenty-five dollars ($25.00) for each and every NSF check received by Licensor during such month.  Licensor reserves the right to set-off this amount from any Contingency Fees due to Licensee.

## 7. OPERATIONS AND TRAINING MANUAL

**7.1.    Operations and Training Manual.**  Licensor shall loan Licensee one copy of the **COLLECT AMERICA** Operations and Training Manual ("O&T Manual") that sets forth certain uniform procedures and guidance for the operation of the Licensed Business as well as standards for the industry.  Licensee acknowledges that the success of the **COLLECT AMERICA** Business depends, in part, on the goodwill resulting from consistent high quality services.  Licensee agrees to strictly adhere to the procedures, specifications and performance standards as set forth in the O&T Manual, including any and all additions or changes thereto as may be determined by Licensor to be appropriate.  Compliance with the O&T Manual is an essential aspect of Licensee's obligations and the failure to substantially comply may be considered to be a breach of this Agreement.

**7.2.    Confidentiality of O&T Manual.**  Licensee acquires no property rights in Licensor's O&T Manual and the O&T Manual shall remain the copyrighted property of Licensor at all times.  It is acknowledged that the O&T Manual contains trade secrets and confidential information, the contents of which may only be revealed to employees on a need-to-know basis.  Licensee will not copy or reproduce the O&T Manual in whole or in part,



without Licensor's prior written consent.  All O&T Manuals must be returned to Licensor immediately upon the expiration, termination or assignment of this Agreement.

7.3.  **Changes to O&T Manual.**  Licensor reserves the right to periodically revise the O&T Manual as Licensor deems necessary to update operating and marketing techniques or standards and specifications.  Within ten (10) days of receiving any updated information, Licensee shall update its copy of the O&T Manual as instructed by Licensor and Licensee's operations shall be conformed in accordance with the updated provisions within a reasonable time thereafter.  Licensee acknowledges that the current master copy of the O&T Manual maintained by Licensor at its principal office shall be controlling in the event of a dispute relative to the content of any O&T Manual.

## 8. LICENSEE'S OPERATIONAL COVENANTS

8.1.  **Employees.**  Licensee will hire, train, and supervise efficient, competent, and courteous employees and independently set the terms and conditions of employment, wages, commissions and incentives of such employees.  Licensor shall have no liability for, nor shall it direct, Licensee's actions, including without limitation, training, background checks, and certification, pursuant to this provision.  Licensee will continually instruct and inform its employees as to all standards and procedures concerning the day-to-day operation of the Licensed Business.  Licensee will take steps to ensure that all employees act in compliance with all laws, statutes, rules and regulations governing those involved in the collection of debt and that said employees are in compliance with the published standards of Licensor now in effect or hereafter adopted.

8.2.  **Maintenance and Upkeep.**  The Licensed Location and the equipment, furnishings, materials and supplies relating to the **COLLECT AMERICA** Business will be maintained in good and orderly condition at all times. Licensor reserves the right to require Licensee to upgrade its equipment from time to time, as Licensor deems necessary to maintain the Network and Program standards.

8.3.  **Compliance with Laws.**  Licensee will conduct itself and operate its business in compliance with all applicable laws and regulations and in such a manner as to promote a good public image in the business and legal community.  Licensee will maintain high ethical standards in the operation of the **COLLECT AMERICA** Business in order to create and maintain goodwill among the public.  Licensee shall immediately notify Licensor in writing of any lawsuits, claims, administrative actions or other legal actions filed against Licensee, or threatened to be filed against Licensee, which relate in any manner to the Licensed Business.

8.4.  **Management.**

(a)  A licensed attorney ("Supervising Attorney") shall conduct and be responsible for the on-site management of the **COLLECT AMERICA** Business.  If Licensee, or in the event Licensee is a Licensed Entity, its managing partner or shareholder, is a licensed attorney, then Licensee or the managing partner or shareholder may either designate him or herself as the Supervising Attorney or another individual as



the Supervising Attorney. If Licensee, or in the event Licensee is a Licensed Entity, its managing partner or shareholder, is not a licensed attorney, then Licensee or the managing partner or shareholder shall designate a Supervising Attorney.

(b) The Supervising Attorney shall initial this Agreement, complete the addendum to this Agreement for Supervising Attorneys ("Exhibit IV") and must: (i) be approved by Licensor in writing as the Supervising Attorney; (ii) agree in writing to be subject to all of the terms and conditions contained in the Transaction Documents, and (iii) attend and successfully complete the initial training program.

(c) Licensee shall take all steps reasonably required to ensure that the Supervising Attorney will devote sufficient time in the direct, on-premises supervision of the **COLLECT AMERICA** Business as is necessary to ensure full compliance with the terms of this Agreement.

(d) In the event that Licensee elects to replace the Supervising Attorney, Licensee shall notify Licensor in writing of the proposed change, pay a transfer fee of Five Thousand Dollars ($5,000), and require that the new Supervising Attorney sign an amended Exhibit IV to this Agreement prior to commencement of duties as Supervising Attorney. In addition, the new Supervising Attorney shall complete a Background Questionnaire, sign this Agreement and the Software License Agreement, and complete Licensor's initial training program within 120 days of hiring.

(e) The failure of Licensee to maintain a Supervising Attorney with an office at the Business is a material breach of this Agreement. Licensor has the right to immediately terminate this Agreement effective upon written notice in the event of such a breach. Licensee, in its sole discretion, may reinstate Licensee if the Supervising Attorney is replaced within fifteen (15) days of such termination and Licensee fully complies with Section 8.4(d) above.

8.5.     **Payments to Creditors**.  Licensee will timely pay all of its obligations and liabilities due and payable to Licensor, suppliers, lessors, creditors, and federal, state and local tax authorities.

8.6.     **Software License Agreement**.  Licensee shall at all times comply with the terms and conditions of the Software License Agreement.

8.7.     **Advertising**.  All advertising must be approved by Licensor in advance of its use, must be done in accordance with sound business judgment and good taste, and must conform with national and local ethical standards required of attorneys. Licensee shall submit all ad copy, mailings or other programs or materials to Licensor for approval at least fifteen (15) business days prior to the proposed date of publication or broadcast.

8.8.     **Working Capital**.  Licensee acknowledges that the **COLLECT AMERICA** Business will require an indeterminate period of time within which to establish sufficient volume to cover the anticipated operating expenses of the Business. Licensee is aware that

License Agreement (06/02)
Licensor Initial _____
Licensee Initial _____
Supervising Attorney _____



8

collections, volume, and costs of doing business will vary due to a number of business factors including, but not limited to, Licensee's management skills, payroll, overhead, location and other variables over which Licensor has no control. Licensee acknowledges that there are initial expenses which will be incurred prior to Licensee's realization of any collection income, including, but not limited to, lease deposits, prepaid rent, utility deposits, prepaid insurance, business license fees, professional expenses, hardware, frame relay line(s), advertising, payroll and promotion costs. Accordingly, prior to the commencement of operations, Licensee will be required to have between Thirty Five Thousand Dollars ($35,000.00) and Forty Five Thousand Dollars ($45,000.00) free of any encumbrance or restraint. Licensor does not warrant that the working capital estimated will be sufficient in all instances. Personal expenses and payroll of Licensee during this start-up period are not included in working capital.

**8.9.** **Statement of Ownership.** Licensee will at all times during the term of this Agreement own and, through its Supervising Attorney, control the **COLLECT AMERICA** Business authorized hereunder. Upon request of Licensor, Licensee will promptly provide satisfactory proof of such ownership to Licensor. Licensee represents that the information contained in Exhibit II to this Agreement which is incorporated herein by this reference, is true, complete, accurate and not misleading. Licensee will promptly provide Licensor with written notification if the information contained in Exhibit II changes at any time during the term of this Agreement and will comply with the applicable transfer provisions contained in Article 18 herein. If Licensee is not an individual, the shareholders, officers and directors, partners or members, as applicable, will execute the Personal Guaranty attached hereto as Exhibit III and incorporated herein by reference.

## 9. LICENSOR'S OBLIGATIONS

**9.1.** **Initial Training Program.** Licensor will, at its expense, provide an initial training program of approximately five (5) days for up to three (3) persons ("Trainees") in Denver, Colorado, or at another location designated by Licensor. Trainees must include the Licensee's Collection Manager, the Licensee, (or if Licensee is a Licensed Entity, its managing partner or shareholder), and, if not one and the same, the Supervising Attorney. The trainees must complete training to the satisfaction of Licensor prior to commencing operation of the **COLLECT AMERICA** Business. Licensee shall pay all costs and expenses incurred by and for Trainees relating to their participation in the initial training program. Prior to commencement of training, Trainees may be required to execute a confidentiality agreement. Replacement Supervising Attorneys must complete the training programs within one hundred twenty (120) days of hiring.

**9.2.** **On-Site Assistance.** Licensor will also provide up to five (5) consecutive or non-consecutive days of training and set-up assistance at the Licensed Location at a time acceptable to Licensee and Licensor.

**9.3.** **Regional Meetings.** Licensor may periodically conduct regional or national meetings for the purpose of discussing common objectives, new methods and programs related to operations. Attendance at no more than two (2) such meetings per year shall be required.



9.4.    **On-Going Assistance.**  Licensor will provide advice and assistance to Licensee concerning the ongoing operation of the **COLLECT AMERICA** Business, as Licensor reasonably deems necessary.  The frequency, manner and substance of such assistance will be determined solely by Licensor and may include recommendations concerning Licensee's methods and techniques, marketing strategies, accounting and administrative procedures, information concerning equipment and supplies and consultations regarding Licensee's operations or specific debt collection issues.

9.5.    **Consultations.**  Upon request, Licensor will provide personal consultations between Licensee and a support representative of Licensor at Licensed Location.  Such consultations shall be at the  sole expense of Licensee and shall be billed to Licensee at the rate of $300.00 per day per person plus all expenses of travel.  Licensor reserves the right, however, to make all determinations regarding the manner and extent of necessary support and assistance to be provided to each Licensee.

9.6.    **Data Center.**  Licensee acknowledges that Licensor currently operates the **COLLECT AMERICA** Data Center, although Licensor reserves the right to outsource the functions of the Data Center, in whole or in part, at any time in its sole discretion. If the Data Center or operating software malfunctions or output errors occur, such malfunctions may result in computer access delays or necessitate data processing reruns.  Licensor shall have no liability for any delay in access to Licensor's equipment or the Data Center. In the event that an operational or system failure, malfunction or error within the control of Licensor results in any damage, injury or other loss to Licensee, Licensor's entire obligation and Licensee's exclusive remedy, shall be as follows:

(a)    Licensor shall provide Licensee with sufficient computer time to allow Licensee to re-establish any data processing that was interrupted by the failure, malfunction or error to the status such processing occupied at the time of the failure, malfunction or error.

(b)    In no event shall Licensor be liable to Licensee in any manner or for any other loss, incurred as a result of any operational or system failure, malfunction, or error, (including, but not limited to, equipment, program or software deficiencies or negligence of Licensor or its employees), beyond providing Licensee sufficient computer time to correct data processing errors or inadequacies caused thereby.

(c)    LICENSEE SPECIFICALLY AGREES THAT ANY LIABILITY OF LICENSOR ARISING FROM BREACH OF WARRANTY, BREACH OF CONTRACT, NEGLIGENCE, STRICT LIABILITY IN TORT OR OTHER LEGAL THEORY, SHALL BE LIMITED TO THE REMEDIES HEREIN.

9.7.    **Software.**  Licensor will provide Licensee with six (6) copies of the Software for operation of the Licensed Business, as further described in the Software License Agreement. Licensor reserves the right to charge Licensee a fee for future upgrades or modifications to the Software.



## 10. REFERRAL OF CAOD BY LICENSOR

**10.1.   Referral of CAOD.**  Licensor may, from time to time, refer CAOD to Licensee for collection pursuant to a Contingency Fee Agreement ("CFA") and the Accounts Available for Distribution Agreement ("AAD Agreement") to be provided to Licensee by Licensor.  Such referrals are in the sole discretion of Licensor.  There is no obligation of any kind or nature created by this Agreement which would require Licensor to refer CAOD to Licensee for collection. Licensee acknowledges that even if Licensor does refer CAOD to Licensee, there is no assurance that such referrals will continue during the term of this Agreement.  If Licensor does, in its discretion, refer CAOD to Licensee, Licensor shall incur no liability there from and Licensor does not warrant the completeness, correctness or accuracy of any information or documentation given to Licensor by any client which is subsequently transmitted to Licensee. The Supervising Attorney must make his or her own independent investigation of the accuracy and completeness of any CAOD referrals.  Licensee must comply with the terms and conditions negotiated by Licensor with the client for any CAOD accepted by Licensee for collection, including but not limited to the contingency or fee.

**10.2.   Acceptance of CAOD.** Licensee shall have twenty-four (24) hours from the date of receipt to notify Licensor whether it will accept the CAOD. Acceptance will be acknowledged upon receipt by Licensor of each AAD Agreement signed by the Supervising Attorney.  Licensee agrees to comply with all terms and conditions of each AAD Agreement as an essential part of this Agreement and acknowledges that Licensor may modify the terms of the AAD Agreement from time to time.  Licensor will use best efforts to ensure the accuracy of the AAD Agreements.  In the event, however, of a discrepancy between the AAD Agreement and Licensor's contract with an account creditor regarding the contingency fee or length of collection referral, or any other item in dispute, the terms of Licensor's contract with such creditor will be controlling.  Licensor will notify Licensee of any such discrepancies as soon as Licensor knows it and adjust the accounts accordingly.  By accepting the CAOD, Licensee acknowledges that Licensor may charge a Placement Fee.

**10.3.   Collection of CAOD.**  Upon acceptance of the CAOD, Licensee shall be responsible for the collection of the debt from the account debtors.  Licensee agrees to follow the procedures of Licensor in the collection of the CAOD and, at a minimum, "Work to Conclusion" the CAOD accounts.  For purposes of this Agreement, the term "Work to Conclusion" shall mean that the account is resolved as a result of any of the following: payment of balance or agreed settlement amount; bankruptcy filed by account debtor; debt is time barred; deemed to be uncollectible by Supervising Attorney upon standards of Licensor and/or creditor client; or unsuccessful litigation. Licensor reserves the right to monitor the debt collection activity of Licensee by accessing the CAOD accounts on the Network. Upon request of Licensee, Licensor may advance court costs or other costs incidental to court proceedings, in its discretion.

**10.4.   Deposit of CAOD Funds.**  Except where prohibited by law or regulation, Licensee shall, pursuant to Section 4.0 of the CFA, on a daily basis, forward all monies collected for each CAOD account to Licensor for balancing and deposit to the appropriate bank account.  Where prohibited by law or regulation, Licensee shall, pursuant to Section 3.0 of the



License Agreement (06/03)
Licensor Initial
Licensee Initial
Supervising Attorney

11

CFA, deposit all monies collected for each CAOD account in a trust account which is designated as the "Collect America Trust Account" ("CATA"). The CATA shall be established at a bank or other depository in the manner designated by Licensor. Licensor shall have the right to withdraw the funds in the CATA at any time, in its sole discretion. Licensee shall provide Licensor with a copy of the CATA monthly bank statement within 7 days after receipt by the Licensee.

**10.5.** **Licensee's Contingency Fees.** Upon collection of the debt and deposit of the funds into the appropriate bank account, Licensee shall be entitled to receive the fee ("Contingency Fee") specified in the AAD Agreement for that CAOD account. The Contingency Fee due Licensee will be reduced by adjustments such as (but not limited to) checks returned by the bank as uncollectible, CRF fees or other fees or amounts due Licensor pursuant to Section 5.2 above, or any returns or refunds. Licensor shall submit payment to Licensee for such net Contingency Fees no less frequently than once per month, by the fifteenth (15th) day of each month for the Contingency Fees due for the immediately preceding month. Licensee and Licensor agree that the term "Contingency Fees" relates specifically to the definition in the Contingency Fee Agreement between the parties. It bears no relationship to any contingency fee agreement(s) that Licensor has or may have entered into with other party(ies), which may exceed the Contingency Fee due Licensee. Licensee acknowledges that its "Contingency Fee" may be a percentage that is less than the total percentage that the client agreed to pay Licensor for collection of the debt, and that Licensor has the right to retain the difference in such amounts.

**10.6.** **Return of CAOD to Licensor.** Upon either (i) the expiration of the placement term specified in the Contingency Fee Agreement; or (ii) the termination or expiration of this Agreement, Licensee agrees to return all CAOD accounts.

## 11. COVENANTS AND CONFIDENTIALITY

**11.1.** **Non-competition During Term.** During the term of this Agreement, Licensee, all other persons whose interest is five percent (5%) or greater in the Licensed Entity, and the Supervising Attorney, all of whose signatures appear below, agree not to engage, in any fashion whatsoever, either directly or indirectly, in any other business which offers or sells any product or service (or any component thereof) which comprises, or may in the future comprise, a part of Licensor's **Collect America** Business, System, Licensed System, Network, Software, Program, and **Collect America** Originated Debt, or which purchases, or acquires on a contingency basis, debt for collection or re-sale from Licensor's suppliers of debt or their subsidiaries, or which acquires funds from Licensor's Lenders for purposes of purchasing such debt, or which competes directly or indirectly with Licensor's **Collect America** Business, System, Licensed System, Network, Software, Program, and **Collect America** Originated Debt if such business is located anywhere in the United States of America, or outside the United States of America if the geographic operating area of such business is within the United States of America. For purposes of this section, the terms Collect America Business, System, Licensed System, Network, Software, Program, and **Collect America** Originated Debt shall have the same meaning and definition as stated in this Agreement, and the term **Collect America** Business shall additionally mean a business



which provides debt collection services through a network of attorneys. Licensee acknowledges that the time and geographical limitation and all other terms and conditions of this covenant are in all respects fair and reasonable given the amount of time and funds expended by Licensor to establish its business, the nature of the information divulged to Licensee, and the nature and scope of Licensor's **Collect America** Business.

    **11.2.**   **Post-Termination Covenant Not to Compete.** In the event that this Agreement is terminated, expires or Licensee otherwise relinquishes its rights to the licensee through assignment or otherwise, for whatever reason, neither Licensee, all other persons whose interest is five percent (5%) or greater in the Licensed Entity, and the Supervising Attorney, all of whose signatures appear below, for a period of two (2) years from the date commencing on the date of termination or expiration, of this Agreement, or the date on which Licensee ceases to conduct the business contemplated by this Agreement, whichever is later, shall engage, in any fashion whatsoever, either directly or indirectly, in any other business which offers or sells any product or service (or any component thereof) which comprises, or may in the future comprise, a part of Licensor's **Collect America** Business, System, Licensed System, Network, Software, Program, and **Collect America** Originated Debt, or which purchases, or acquires on a contingency basis, debt for collection or re-sale from Licensor's suppliers of debt or their subsidiaries, or which acquires funds from Licensor's Lenders for purposes of purchasing such debt, or which competes directly or indirectly with Licensor's **Collect America** Business, System, Licensed System, Network, Software, and **Collect America** Originated Debt if such business is located anywhere in the United States of America, or outside the United States of America if the geographic operating area of such business is within the United States of America. For purposes of this section, the terms **Collect America** Business, System, Licensed System, Network, Software, Program, and **Collect America** Originated Debt shall have the same meaning and definition as stated in this Agreement, and the term **Collect America** Business shall additionally mean a business which provides debt collection services through a network of attorneys. Licensee acknowledges that the time and geographical limitation and all other terms and conditions of this covenant are in all respects fair and reasonable given the amount of time and funds expended by Licensor to establish its business, the nature of the information divulged to Licensee, and the nature and scope of Licensor's **Collect America** Business. In the event that a court of competent jurisdiction determines that either the time or geographic limitations of this Section 11.2 are overly broad, then the court shall adjust the offending limitation, so as to fashion an enforceable covenant. This Section 11.2 shall not apply to the placement of accounts contemplated by section 13 of the Master Accounts Available for Distribution Agreement between Collect America Ltd., CACV of Colorado, LLC, CFSC Capital Corp XXXIV, and Licensee (referred to as Franchisee Subservicer in the Master Accounts Agreement).

    **11.3.**   **No Diversion.** During the term of this Agreement, and for a period of one (1) year after the termination or expiration of this Agreement, neither Licensee, any person whose interest in the Licensed Entity is five percent (5%) or greater, and the Supervising Attorney, shall divert or attempt to divert any collection business related to, or any client or account of Licensor, by direct inducement or otherwise, or divert or attempt to divert the employment of



any employee of Licensor, to the Licensee's **COLLECT AMERICA** Business or to any similar business.

**11.4.  Confidential Information.**  Licensee acknowledges that Licensor, in fulfilling its requirements under the terms of this Agreement, must disclose established trade secrets, client account information, production and sales methods and the unique techniques and procedures related to the Program (hereinafter referred to as "Confidential Information") which are necessary for the operation of a **COLLECT AMERICA** Business.  Licensee specifically acknowledges that all such Confidential Information is valuable and unique and that such information comprises a substantial portion of the assets of Licensor.  Licensee shall not utilize all or any portion of such Confidential Information subsequent to the termination of this Agreement or at any time disclose all or part of the same to any person, firm, corporation, or other entity for any reason or purpose without the prior written consent of Licensor.  Licensee agrees not to copy, publish, or otherwise duplicate Licensor's Confidential Information or permit others to do so.   Licensee may disclose Confidential Information to Licensee's employees, agents, or representatives only to the extent necessary for said employees, agents or representatives to carry forth their intended function on behalf of Licensee.

**11.5.  Confidentiality Agreements.**  Upon request of Licensor, Licensee shall have each employee, agent and representative sign the standard **COLLECT AMERICA** Confidentiality Agreement and provide signed copies to Licensor.

**11.6.  Invalidity of Covenants.**  Licensee acknowledges that the restrictions set forth in Sections 11.1 through 11.5 are reasonable and necessary for the protection of Licensor's proprietary interests; that any violation of these restrictions would cause substantial and irreparable injury to Licensor; and, that Licensor would not have entered into this Agreement without receiving Licensee's unrestricted promise to preserve the confidentiality of the proprietary information concerning the business of Licensor.  In any litigation in which Licensor seeks to enjoin Licensee, its agents or employees from violating the restrictions set forth in Sections 11.1 through 11.5, Licensee, voluntarily and for value, waives such defenses as Licensee might otherwise have under the law of the jurisdiction relating to any claimed "prior breach" on the part of Licensor.  Furthermore, it is specifically understood and agreed that no action or lack of action on the part of Licensor will entitle or permit Licensee to disclose Confidential Information under any circumstances without Licensor's prior written consent.

## 12. TERM AND RENEWAL

**12.1.  Term.**  The term of this Agreement is for a period of five (5) years from the date of execution by Licensor and Licensee, unless terminated earlier in accordance with Section 18.

**12.2.  Renewal.**  At the end of the initial term of this Agreement and upon satisfying certain conditions set forth below, Licensee may renew the rights granted hereunder for one additional terms of five (5) years upon payment of a renewal fee of Five ~~Thousand~~ Dollars ($500.00) per term, and upon satisfying the following conditions: Hundred



License Agreement (06/02)
Licensor Initial _____
Licensee Initial _____
Supervising Attorney Initial _____

14

(a)    Has substantially complied with all provisions of this Agreement during the current term, including the payment of all CRFs, fees and other monies due hereunder;

(b)    Executes the then current form of the License Agreement as required by Licensor; and

(c)    Executes a general release of all claims and termination of all rights in connection with this Agreement that may have arisen during the term preceding renewal.

**12.3.    Exercise of Option to Renew.**    Licensee shall exercise its renewal option through written notice to Licensor not later than one hundred eighty (180) days prior to the scheduled expiration of any term of this Agreement.  The renewal fee for each additional five (5) year term is due and owing upon, or prior to, the expiration of the initial term or any such renewal term.  Licensee's renewal shall become effective upon execution of Licensor's then current License Agreement and payment of the renewal fee set forth herein.

**12.4.    Conditions of Refusal.**    Licensor may decline to renew this Agreement if Licensee has not timely paid all amounts required under this Agreement, or Licensee has not cured any material breach of this Agreement to Licensor's satisfaction during the term hereof.  Licensor shall give notice that it will decline to renew this Agreement at least sixty (60) days prior to the expiration of the term.  Such notice shall set forth the reasons Licensor so declines.

## 13.  QUALITY CONTROL

**13.1.    Standards and Specifications.**    Licensee agrees to maintain and operate the **COLLECT AMERICA** Business in compliance with this Agreement and the standards and specifications contained in the O&T Manual, as the same may be modified from time to time.

**13.2.    Pricing.**    Except for the CAOD placements, Licensee shall, at its sole discretion, be free to price its services at any competitive level determined by Licensee to be appropriate under the circumstances.

**13.3.    Changes in Standards and Specifications.**    Licensor will make available to Licensee standards and specifications for the equipment, computers, software, services, supplies and materials used in connection with the **COLLECT AMERICA** Business, which standards and specifications Licensor reserves the right to change upon thirty (30) days prior written notice to Licensee.  Licensee acknowledges that the Software, System and related business methods are of a nature that will most likely change, evolve and be improved by Licensor, as may be deemed necessary and appropriate by Licensor.

**13.4.    Restrictions on Services and Materials.**    If Licensee proposes to use any equipment, computers, software, services, supplies or materials which are not previously approved by Licensor as meeting its specifications, Licensee will first notify Licensor in writing requesting approval.  In order to    approve such request, Licensor may require submission of

License Agreement (06/03)
Licensor Initial
Licensee Initial
Supervising Attorney

15

specifications, information, or samples of such items. Licensor will advise Licensee within a reasonable time whether such items meet its specifications.

**13.5.    Approved Suppliers.** Licensee must purchase all items or services used in the operation of the **COLLECT AMERICA** Business from suppliers either designated by Licensor or from such other suppliers whose products and services meet all of Licensor's specifications and standards as to quality, and who are able to adequately demonstrate their capacity and facilities to supply Licensee.

**13.6.    Inspection.** Licensee will permit Licensor, or its designated representative, to inspect the Licensed Location and **COLLECT AMERICA** Business during regular business hours, with or without notice. Licensee will promptly furnish, upon request, any information regarding the supplies, equipment, services and methods used in conducting its **COLLECT AMERICA** Business.

## 14. INSURANCE

**14.1.    Insurance Coverage.** At all times during the term of this Agreement, Licensee shall, at its own expense, keep in force the following:

(a)    General Liability Umbrella Policy of not less than $1,000,000.00, for protection against the claims of all persons, employees, clients, or otherwise. This policy shall provide minimum coverage of Two Hundred Thousand Dollars ($200,000.00) per occurrence;

(b)    A Fidelity Bond in the amount of Twenty Five Thousand Dollars ($25,000.00). The Fidelity Bond shall insure both Licensee and Licensor against any liability that may accrue against either of them by reason of Licensee's ownership, maintenance, or operation of the **COLLECT AMERICA** Business, or by reason of Licensor's relationship to Licensee. Licensee shall review such Fidelity Bond annually and modify the coverage as necessary to be in compliance with this Section 15.1(b); and

(c)    Worker's Compensation Insurance and Legal Malpractice Insurance in such amounts as may be required by regulations of the state or State Bar in which Licensee operates. Provided, however, there shall be a minimum requirement of $1,000,000.00 coverage under the Legal Malpractice Insurance policy. Licensee is responsible for monitoring its own state regarding government's minimum amounts for bonds and/or insurance coverage.

**14.2.    Policy Provisions.** Licensee shall name Licensor as an additional insured party under the General Liability and Fidelity Bond policies required herein and shall make certain a certificate of insurance reflecting full compliance with these requirements is at all times on file at the general office of Licensor within ten (10) days of issuance of each policy and not more than thirty (30) days after signing this Agreement. Licensee will promptly pay all premiums on those policies when due. Licensee will cause insurer to include Licensor as a party to be notified in regard to cancellation, expiration, or renewal of all such policies.

License Agreement (06/02)
Licensor Initial _____
Licensee Initial _____
Supervising Attorney _____


16

**14.3.   Proof of Insurance.** Licensee will provide proof of insurance to Licensor prior to commencement of operation of the **COLLECT AMERICA** Business. Licensor has the right to change  the minimum amount of insurance that Licensee is required to maintain upon prior written and reasonable notice, giving due consideration to what is reasonable and customary in a similar business. Noncompliance with the insurance provisions set forth herein shall be deemed a material breach of this Agreement.

**14.4.   Additional Coverage.** It shall be the responsibility of Licensee, at its option and expense, to maintain fire and extended coverage insurance and business interruption insurance to protect Licensee from damage to its business operations and items of property located in Licensee's office, Licensor's office or at the premises of any data processing center at which the **COLLECT AMERICA** Data Center has been outsourced. Licensee agrees Licensor shall have no liability for any damage or loss, actual or consequential, resulting to the business or property of Licensee. Licensee hereby waives all rights of recovery and subrogation for damages to property or business by reason of computer down-time, fire, the elements, vandalism and malicious mischief or any other cause which could be insured against under the terms of standard fire and extended coverage and business interruption insurance policies.

## 15. INDEPENDENT CONTRACTOR; INDEMNIFICATION

**15.1.   Business Relationship.** Licensor and Licensee are independent contractors and shall in no way be considered as an agent, partner or employee of the other. It is understood and agreed that no agency or partnership relationship between Licensee and Licensor is created by this Agreement.  As such, Licensee has absolutely no authority to bind Licensor or incur any liability for or on behalf of Licensor or to represent itself as anything other than an independent contractor.   Neither Licensor nor Licensee will make any agreements, representations or warranties in the name of or on behalf of the other or represent that their relationship is other than Licensor and Licensee.

**15.2.   Indemnification.** Licensee hereby indemnifies and holds Licensor, its officers, directors, employees, agents and representatives, harmless from any and all liability, loss or damage Licensor may suffer as the result of claims, demands, costs or judgments against Licensor arising out of Licensee's operation of the **COLLECT AMERICA** Business, or the relationship of the parties under this Agreement, or arising out of the use of the Program in any manner not in accordance with this Agreement, whether the liability, loss or damage is caused by or arises out of any act of Licensee or Licensee's officers, employees, agents or otherwise. This indemnity shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

**15.3.   Notice.** Licensee shall give written notice to Licensor of any act or occurrence of which Licensee is required to indemnify Licensor not more than five (5) days after the act or occurrence becomes known to Licensee. That Licensee did not know of the act until sometime after its occurrence shall not excuse the giving of this notice, if in the exercise of reasonable care, Licensee should have known of such act.  In the event any claim is asserted against Licensor with respect to any matter addressed in Section 15.2, Licensee agrees that Licensor



may select and employ attorneys to appear and defined against the claim on behalf of Licensor at the expense of Licensee. Licensor shall have the sole discretion concerning the defense of such claim and shall be the sole judge of the acceptability of any compromise or settlement.

## 16. REPORTS, FINANCIAL STATEMENTS AND AUDIT RIGHTS

**16.1.   Books and Records.** Licensee agrees to keep complete and accurate books and records relating to all activities of the Licensed Business, and the receipt of income as a result thereof, in accordance     with the accounting requirements outlined in the O&T Manual, and such other specific directions as Licensor may hereafter reasonably require by written instruction or pre-printed forms. Licensee shall maintain the original copies of such records for a minimum of seven (7) years unless a longer period is required under Federal or State laws or regulations.

**16.2.   Licensee Reports.**   Licensee shall prepare and forward to Licensor such periodic accounting statements and reports as Licensor may require to enable Licensor to verify Gross Collections of Licensee.

**16.3.   Audit.**   Licensor, or its designee, in order to verify Gross Collections, may inspect and/or audit all business records of the Licensed Business at any time during regular business hours upon reasonable notice. In the event that any audit discloses an understatement of Licensee's Gross Collections of at least one percent (1%), Licensee shall immediately pay all deficiencies, including interest at the rate set forth in Section 6.4. If any audit by Licensor discloses an understatement of Gross Collections of two percent (2%) or greater, Licensee shall pay, in addition to the amount of the understatement and interest, Licensor's reasonable costs of such audit, including expenses for travel, meals and lodging.

## 17. ASSIGNMENT

**17.1.   Assignment by Licensor.**   Licensor has the right to assign or transfer this Agreement to a third party and such assignment or transfer shall inure to the benefit of any of its assignees or other legal successors in interest.

**17.2.   Assignment by Licensee.**   The rights and duties created by this Agreement are personal to Licensee. As a result, neither this Agreement (or any interest therein) nor any part or portion of Licensed Entity, or a substantial portion of the assets used in connection with the Licensed Business may be transferred without Licensor's prior written approval and compliance with Section 17.3 below.

**17.3.   Pre-Conditions to Licensee's Assignment.**   Licensee may not sell, transfer or assign its rights under this Agreement, or any interest in it, or any part or portion of the Licensed Entity, or a substantial portion of the assets used in connection with the Licensed Business, unless:  (i) Licensee obtains Licensor's written consent, which shall not be unreasonably withheld; and (ii) Licensee strictly complies with the following:



License Agreement (06/02)
Licensor Initial _____
Licensee Initial _____
Supervising Attorney Initial _____

18

(a)    The proposed transferee must be acceptable to Licensor based on the standards then utilized by Licensor in considering applicants for new Licensees.  The proposed transferee must possess sufficient financial resources and net worth to support payment for the business and its operation thereafter to the reasonable satisfaction of Licensor;

(b)    The proposed transferee must execute all agreements Licensor is then requiring of new Licensees, including the then current License Agreement;

(c)    Licensee must satisfy all of its existing obligations to Licensor or the proposed transferee shall agree to bring the Licensed Business into reasonable conformity with the then current standards;

(d)    The proposed transferee must pay Licensor's then current published training fee and successfully complete Licensor's training program to the reasonable satisfaction of Licensor prior to assumption of operational control of the Licensed Business;

(e)    Licensee or proposed transferee shall pay a transfer fee to Licensor in the amount of Five Thousand Dollars ($5,000.00);

(f)    The transferring Licensee must execute a general release of any and all claims against Licensor, its officers, directors, employees, agents and affiliates of Licensor arising up to the effective date of the transfer in a form satisfactory to Licensor; and

(g)    Licensee shall provide Licensor with written notice of the proposed transfer, including a final copy of the agreement with the proposed transferee, at least sixty (60) days prior to the proposed transfer date.

**17.4.    Licensor's Approval of Transfer.**  Licensor shall have fifteen (15) days from the date of notice and receipt of appropriate background information from Licensee to approve or disapprove of Licensee's proposed assignment.  Licensee acknowledges that the proposed transferee shall be evaluated for approval by Licensor based on the same criteria as is currently being used to assess new Licensees and that such proposed transferee shall be provided with all disclosures required by applicable state or federal law.

**17.5.    Licensee's Death or Disability.**  Upon the death or permanent disability of an individual Licensee (or a guarantor of Licensee's obligations under the Agreement, or an owner of 5% or more of the equity interest of a Licensed Entity), the executor, administrator, conservator, guardian or other personal representative of such person shall transfer his or her interest in this Agreement, or such interest in the Licensed Entity, to a party approved by Licensor.  Such disposition of this Agreement or such interest shall be completed within a reasonable time, not to exceed six (6) months from the date of death or permanent disability, and shall be subject to all the terms and conditions applicable to transfers contained in this Agreement.  Failure to transfer the interest in this Agreement or such interest in the Licensed

License Agreement (06/02)
Licensor Initial
Licensee Initial
Supervising Attorney 

19

Entity within said period of time shall constitute a breach of this Agreement. For purposes hereof, the term "permanent disability" shall mean a mental or physical disability, impairment or condition, determined by an independent qualified and licensed physician within the state of the Licensed Location, that is reasonably expected to prevent or actually does prevent Licensee from supervising the management and operation of the **COLLECT AMERICA** Business for a period of three (3) months from the onset of such disability, impairment or condition.

## 18. DEFAULT AND TERMINATION

**18.1.    Termination By Licensor.**  Licensor may terminate this Agreement only for good cause without prejudice to the enforcement of any legal or equitable right or remedy. Except as hereinafter provided, the termination will be effective immediately upon giving written notice of such termination and the reason or cause for the termination. Without in any way limiting the generality of the meaning of the term "good cause," the following occurrences shall constitute sufficient cause for Licensor to terminate this Agreement:

(a)    Failure by Licensee and its Supervising Attorney, if different from Licensee, to complete the training program to the reasonable satisfaction of Licensor. In such event, Licensee shall receive a refund of Twenty Thousand Dollars ($20,000) of the initial license fee within thirty-days (30) of such termination;

(b)    The insolvency of Licensee or any general assignment for the benefit of creditors;

(c)    The filing of any voluntary or involuntary petition in bankruptcy by or against Licensee, or the appointment of any receiver or trustee to take possession of property of Licensee, unless such petition or appointment is set aside or withdrawn or ceases to be in effect within twenty (20) days of the date of such filing or appointment; (NOTE: This provision may not be enforceable under the Bankruptcy Reform Act of 1978, Title 11, U.S. Code);

(d)    A final judgment or unappealed decision of a court, regulatory office or agency, that results in temporary or permanent suspension of any permit or license, including a license to practice law, the possession of which is a prerequisite to operation of the Licensed Business under applicable law, or if Licensee pleads guilty to or is convicted of a felony;

(e)    Failure to pay to Licensor any fees or monies within the time required by this Agreement, which failure is not cured within ten (10) days after written notice is sent by Licensor;

(f)    Any misstatement of fact or failure to accurately report any fact or financial information of a material nature either furnished with the License application or that Licensee is required to make to Licensor pursuant to this Agreement, including, but not limited to, the Background Questionnaire;



(g)     Closure or abandonment of the Licensed Business for a period of three (3) consecutive business days;

(h)     Failure to cooperate in the mandatory arbitration procedures provided for in Section 22 of this Agreement;

(i)     Use of the Marks of Licensor not in conformity with this Agreement;

(j)     Engaging in any unauthorized business in competition with Licensor, or making an unauthorized assignment of this Agreement, the Business or an interest in the Licensed Entity;

(k)     Loss of the Supervising Attorney; or

(l)     Violation of any of the other provisions of this Agreement, including without limitation, breach of confidentiality, trade secrets violations, or diversion of Licensor's clients, which violations are not corrected within thirty (30) days after written notice of default by Licensor, unless Licensee can demonstrate a substantial good faith continuing effort to correct such default to the satisfaction of Licensor in its reasonable discretion, or

(m)     Any information obtained from a background investigation of Licensee, its owners, or supervising attorney that in Licensor's sole opinion disqualifies Licensee from acquiring or maintaining a license under the Agreement.

**18.2.**  **Obligations of Licensee Upon Termination or Expiration.** Upon termination or expiration of this Agreement, Licensee shall:

(a)     Immediately pay all CRF's and other fees, monies and charges owed to Licensor;

(b)     No longer represent itself as a **COLLECT AMERICA** Licensee and cease the use of the Marks, Software, System, Network, processes, materials, methods and promotional materials provided by Licensor and take all necessary steps to disassociate itself from Licensor;

(c)     Return the Software, the O & T Manual, and all of the other proprietary information to Licensor within forty-eight (48) hours;

(d)     Immediately take steps to de-identify the Licensed Location so as to distinguish it from a **COLLECT AMERICA** Business, including removal of signage, alteration of distinctive coloring, interior and exterior design and other aspects of the premises uniquely associated with the **COLLECT AMERICA** name and Marks;



(e)    Promptly take such action as may be required to cancel all assumed or trade names or equivalent registrations relating to the use of the **COLLECT AMERICA** name and Marks;

(f)    Abide by the restrictive covenants contained in this Agreement; and

(g)    Transfer and promptly return all CAOD accounts to Licensor as required under Section 10.6 of this Agreement.

**18.3.**   **Survival of Obligations.**  In the event that Licensee retains CAOD accounts that are in the process of collection upon termination of this Agreement, Licensee acknowledges and agrees that all provisions of this Agreement related to the collection of such accounts will remain in full force and effect until all such accounts are no longer being collected by Licensee.

**18.4.**   **Cross Default.**  Any default or breach by Licensee of the Software License Agreement may, at the option of Licensor, constitute a breach or default of this Agreement.

**18.5.**   **State Law.**  If any mandatory provisions of the governing state law prohibit termination of this Agreement or limit Licensor's rights to terminate to some other basis or terms than are herein provided, or require renewal hereof, or require repurchase hereunder, then said mandatory provisions of state law shall be deemed incorporated in this Agreement by reference and shall prevail over any inconsistent terms hereof.

## 19. OPTION TO PURCHASE ADDITIONAL LICENSE

**19.1.**   **Option to Purchase Additional License.**  Licensee may purchase additional licenses for the development and operation of an additional **COLLECT AMERICA** Business for a discounted initial license fee of 75% of the then current initial license fee for each additional location; provided however, that such discount is available only if Licensee is in compliance with this Agreement and has commenced operation of the Licensed Business authorized hereunder. Except for the discounted initial license fee, the additional license will be subject to all of the terms and conditions that are contained in the License Agreement in effect at the time of the sale. For each additional license purchased, a separate License Agreement must be executed. Unless otherwise mutually agreed to in writing by Licensor and Licensee, payment in full of the discounted initial license fee is due and payable to Licensor upon execution of the License Agreement and is nonrefundable in all circumstances. Notwithstanding the foregoing, the grant of an additional license shall be conditional upon and subject to Licensor's ability to comply with all applicable laws and regulations regarding the sale of the license. Licensor shall use its reasonable efforts to enable   Licensee to exercise the option granted hereunder; however Licensor makes no guarantee that such a license can be granted at the time that Licensee desires to exercise the option.



## 20. NOTICES

**20.1.   Notices.** All notices or demands required under this Agreement shall be made in writing and shall be deemed to be fully given when deposited in the U.S. Certified Mail, postage prepaid, return receipt requested, or when sent by overnight delivery service providing documentation of receipt, at the address set forth in the first paragraph of this Agreement or at such other addresses as Licensor and Licensee may designate from time to time.

## 21. ARBITRATION

**21.1.   Arbitration.** Except for controversies, disputes or claims related to or based on the Marks, all controversies, claims, for money or otherwise, and disputes arising out of or relating to this Agreement, attached Exhibits, and Manuals or the breach thereof, the offer and sale of the License including actions by Licensor's officers, directors, employees and brokers, if any; the relationship of the parties hereto; the validity or enforceability of this Agreement, the attached Exhibits and any provision(s) thereof; or any standard specification, or operating procedure prescribed by Licensor; which are not resolved to the mutual satisfaction of Licensor and Licensee within fifteen (15) days after either shall notify the other in writing of such controversy, dispute, or claim shall be settled by arbitration substantially in accordance with the Commercial Arbitration Rules of the American Arbitration Association (AAA), incorporating, however, the Colorado Rules of Procedure pertaining to discovery and the following policies and procedures which shall supersede any rules of the AAA to the extent they may be in conflict:  (a) each party shall select one (1) neutral arbitrator and the two (2) arbitrators so selected shall select a third neutral arbitrator and the majority decision of the three (3) arbitrators shall be final;  (b) the arbitrators shall be attorneys or former judges; (c) the arbitration proceedings and the decision of the arbitrators shall be confidential and non-disclosable except to the extent necessary to comply with any applicable law or regulation; (d) discovery which is conducted in the course of the arbitration proceeding shall be limited to ten (10) interrogatories, including subparts, ten (10) document production requests, including subparts, and three (3) depositions, unless otherwise agreed to by the parties or as ordered by the arbitrators; and (e) the arbitrators' award shall be in writing and shall set forth their findings of fact and conclusions of law supported by a reasoned opinion. If either party does not respond or comply with these rules, or does not attend any unexcused hearings in connection therewith, a default judgment or a default award against them shall be made.

**21.2.   Arbitration Award.** The arbitrators shall have the right to award or include in the award any relief deemed proper, including, without limitation, money damages (with interest on unpaid amounts from date due) and specific performance provided that the arbitrator will not have the right to award exemplary or punitive damages.  Both parties agree that judgment upon the award rendered by the arbitrators is binding and conclusive and may be entered in any competent court, including, without limitation, the state(s) of the Licensed Location, having jurisdiction thereof and shall be enforceable against either or both parties.

**21.3.   Limitations on Proceedings.** The arbitration will be conducted on an individual, not on a class-wide basis and an arbitration proceeding between Licensor and

License Agreement (06/02)
Licensor Initial _____
Licensee Initial _____
Supervising Attorney Initial _____

23

Licensee, or any affiliate or owner of Licensee, may not be consolidated with any other arbitration proceeding between Licensor and any other person or entity.

**21.4.** **Location of Arbitration.** All arbitration proceedings shall be held in the metropolitan area in which Licensor's national headquarters are located (currently Denver, Colorado) and Colorado law shall be applied to all such controversies, claims and disputes.

**21.5.** **Injunctive Relief.** Notwithstanding the foregoing provisions of arbitration, Licensor shall have the right to obtain injunctive relief to terminate or prevent the continuation of any existing default or violation, or to prevent the occurrence of any threatened default or violation of this Agreement, including, without limitation, the unauthorized use or infringement of the Mark. Injunctive relief may be obtained under customary equity rules, including applicable rules for obtaining restraining orders and preliminary injunctions, except that Licensee agrees that Licensor may have such injunctive relief without necessity of posting a bond, but upon due notice if warranted by the circumstances, and the sole remedy of Licensee in the event of the entry of such injunctive relief shall be the dissolution of the same, if warranted, upon hearing duly held.

**21.6.** **No Withholding of Payment.** Licensee shall not withhold payment of any CFR or any other amounts owed to Licensor during the pendency of any controversy, claim or dispute. Licensee shall not be entitled to any deduction or set-off of any kind against the CFR or any other amounts owed to Licensor.

**21.7.** **Attorneys' Fees and Costs.** In any controversy, claim or dispute, regardless of whether arbitration proceedings are initiated, the prevailing party shall be entitled to receive from the other party all reasonable costs relating to the controversy, claim or dispute including, without limitation, costs of investigation, proof of facts, arbitrators' fees, preparation, and reasonable attorney's fees whether inside and/or outside counsel is utilized.

## 22. MISCELLANEOUS PROVISIONS

**22.1.** **Invalidity.** The invalidity of any portion of this Agreement shall not be deemed to affect the validity of any other provision. In the event that any provision of this Agreement is invalid, the remaining provisions shall be deemed to be in full force and affect as if both parties subsequent to expungement of the invalid provisions had executed them. The arbitrators or any court of competent jurisdiction before whom an action is brought to enforce any covenant not to compete or similar provisions of this Agreement shall have the power and duty to reform said sections so that they are read to be enforceable as to time and distance that is the maximum permitted by law, not to exceed, however, either the time or distance set forth herein.

**22.2.** **Cumulative Effect.** All rights and remedies available to Licensor, either by virtue of this Agreement or granted by law, or otherwise afforded to Licensor, shall be cumulative and not alternative.

**22.3.** **Modification.** Licensor and/or Licensee may modify this Agreement only upon execution of a written agreement between the parties. Licensor may modify its standards and



specifications set forth in the O & T Manual unilaterally under any conditions and to the extent that Licensor, in its sole discretion, deems necessary to protect, promote, or improve the Marks and the quality of the Program. Such modifications will not be made without good cause and will not materially alter this Agreement. Licensee agrees to accept and utilize any such changes or modifications that are reasonably requested as if they were a part of this Agreement.

**22.4.** **Governing Law/Consent to Jurisdiction.** This Agreement shall be governed by and construed in accordance with the laws of the State of Colorado, except to the extent governed by the United States Trademark Act of 1946 (Lanham Act; 15 U.S.C. 1051 et seq.) and except in the event that the laws of the state where Licensee resides or the Licensed Business is located provide that the Agreement be governed by and construed in accordance with such state's laws, then such state's laws shall control. Licensor and Licensee shall institute any action directly or indirectly relating to this Agreement (which is not required to be arbitrated hereunder) in any state or federal court of general jurisdiction in the state of Colorado and Licensee irrevocably submits to the jurisdiction of such courts and waives any objection it may have to either the jurisdiction of or venue in such courts.

**22.5.** **Entire Agreement.** The Transaction Documents contain the entire agreement between Licensor and Licensee and supersedes any and all prior agreements concerning the subject matter hereof. Licensee agrees and understands that Licensor shall not be liable or obligated for any oral commitments made and that no modifications of this Agreement shall be effective except those in writing and signed by both parties. Licensor does not authorize and shall not be bound by any representation of any nature other than those expressed in this Agreement. Licensee further acknowledges and agrees that no representations have been made to it by Licensor, or any agent of Licensor, regarding projected collection volume, market potential, revenues, CAOD, profits of Licensee's Business, or operations assistance other than as stated in this Agreement and Licensor's Uniform Franchise Offering Circular and all exhibits thereto.

**22.6.** **Force Majeure.** Neither Licensor nor Licensee shall be liable or deemed in default of this Agreement for any delay or failure in performance of any non-monetary obligation hereunder resulting directly or indirectly from any cause beyond the control of the party in default, including but not limited to the failure or delay of any third party provider of Network or non-Network computer services to Licensor and Licensee.

**22.7.** **Waiver.** No delay or omission to exercise a right, power, or remedy accruing to one party on any breach or default of this Agreement shall be construed as a waiver of such right, power, or remedy of said party. Any waiver, permit, consent or approval of any kind or character on the part of Licensor of any breach or default under this Agreement or any waiver on the part of Licensor of any provision or condition of this Agreement shall be in writing and signed by Licensor and shall be effective only to the extent specifically set forth in such writing.

**22.8.** **Effective Date.** This Agreement will not become effective until it has been fully executed by both Licensor and Licensee. Any insertions to the Agreement or any Addendum hereto must be initialed by both Licensor and Licensee to be effective.



License Agreement (06.02)
Licensor Initial _____
Licensee Initial _____
Supervising Attorney _____

25

22.9.  **Captions.**   Captions to and headings of Sections are: (i) solely for the convenience of the Parties, (ii) are not a part of this Agreement, and (iii) shall not be used for the interpretation or determination of this Agreement or any provision hereof.

22.10. **Construction.**   Unless the context requires otherwise, words denoting the singular may be construed as denoting the plural and words denoting the plural may be construed as denoting the singular.   The pronouns "it" or "its" are used herein to describe Licensee without regard to gender and/or the fact Licensee may be either a person or an entity.

22.11. **Acknowledgement.**   Licensee acknowledges that it has had a copy of this Agreement in its possession for a period of time of not less than ten (10) business days, and prior to executing this Agreement, has had the right to seek and obtain such independent legal and accounting advice as Licensee deemed appropriate.   Licensee has read, understands, and agrees to all of the terms and conditions set forth in this Agreement and states for all purposes that the same are fair and equitable to both parties.   Licensee acknowledges that there are no other agreements between the parties except as herein contained.   Licensee states and certifies that the decision to execute this Agreement is based solely on Licensee's own examination of the business prospects and potential earnings of the same and such other factors as Licensee has deemed important and is not in any case based on any statement or representation of potential earnings of Licensor, nor any agent, representative or employee of Licensor.

22.12. **Background Check.** Licensee acknowledges that Licensee, any owner of Licensee, and any supervising attorney will, if not already signed and completed, simultaneously with signature of this Agreement or upon future requests from Licensor during the term of this Agreement, each individually complete and sign a Background Questionnaire authorizing Licensor or its agent to conduct a background investigation prior to or after granting a license to Licensee under the terms of this Agreement.   Licensor reserves the sole right to refuse the grant of a License or terminate any existing license based upon the results of the Background investigation or answers to the Questionnaire that in Licensor's sole opinion disqualifies Licensee from acquiring or maintaining a licensee under this Agreement.

**IN WITNESS WHEREOF**, Licensor and Licensee have executed this Agreement on this 13th day of March, 2003.

**LICENSOR:**

**COLLECT AMERICA, LTD.**

By: _____

P. Scott Lowery, CEO

**LICENSEE:**

**THE LAW OFFICE OF CURTIS O. BARNES, P.C.**

By: _____
    Curtis O. Barnes, President

**SUPERVISING ATTORNEY:**

By: _____
    Curtis O. Barnes, Esq.

**EXHIBIT I**
**TO LICENSE AGREEMENT**

**ADDENDUM TO COLLECT AMERICA, LTD.**
**LICENSE AGREEMENT**

1.    The full and complete name of the Licensee is:

      The Law Office of Curtis O. Barnes, P.C.

2.    The full and complete street address of the Licensee is:

      _____
      Building Name (if any)

License Agreement (06/0...)
Licenser Initial
Licensee Initial
Supervising Attorney

27

Suite or Room Number

____390____                    W. Cerritos Ave.
Street Number                  Street Name

Anaheim                        CA                  92805
City                           State               Zip Code (9 digit)

If the "mailing address" is different from the above, the mailing address is:

_____

_____

3.    The Threshold Number for the state of _California_ is __6__.



**EXHIBIT II**
**TO LICENSE AGREEMENT**

## STATEMENT OF OWNERSHIP

**Licensee:** **The Law Office of Curtis O. Barnes, P.C.**

Form of Ownership
(Check One)
\_\_\_\_ Individual \_\_\_\_ Partnership \_\_X\_\_ Corporation \_\_\_\_ Other (Describe)

If a Partnership, provide name and address of each partner showing percentage owned, whether active in management, and indicate the state in which the partnership was formed.

If a Corporation, give the state and date of incorporation, <u>the names and addresses of each officer and director</u>, and list the names and addresses of every shareholder showing what percentage of stock is owned by each.

If a Limited Liability Company, or other type of business entity, give the state and date of organization, and list the names, addresses and ownership interest percentage of each member.

Jan 5, 1981                California

Curtis O. Barnes          100%

Curtis O. Barnes Officer and sole director

390 W. Cerritos Ave.

Anaheim, CA 92805

Use additional sheets if necessary. Any and all changes to the above information must be reported to Licensor in writing.

March 13, 2003
Date                                         Curtis O. Barnes, Esq.



EXHIBIT III

### TO LICENSE AGREEMENT

### <u>GUARANTY AND ASSUMPTION OF LICENSEE'S OBLIGATIONS</u>

In consideration of, and as an inducement to, the execution of the above License Agreement (the "Agreement") by Collect America, Ltd. ("Licensor"), each of the undersigned hereby personally and unconditionally:

a.  Guarantees to Licensor and its successors and assigns, for the term of this Agreement, including renewals thereof, that The Law Office of Curtis O. Barnes, P.C., ("Licensee") shall punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement; and

b.  Agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement.

Each of the undersigned waives the following:

1.  Acceptance and notice of acceptance by Licensor of the foregoing undertaking;

2.  Notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guaranteed;

3.  Protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed;

4.  Any right he or she may have to require that any action be brought against Licensee or any other person as a condition of liability; and

5.  Any and all other notices and legal or equitable defenses to which he or she may be entitled.

Each of the undersigned consents and agrees that:

1.  His or her direct and immediate liability under this guaranty shall be joint and several;

2.  He or she shall render any payment or performance required under the Agreement upon demand if Licensee fails or refuses punctually to do so;

3.  Such liability shall not be contingent or conditioned upon pursuit by Licensor of any remedies against Licensee or any other person;

License Agreement (06/02)
Licensor Initial
Licensee Initial
Supervising Attorney



30

4.    Such liability shall not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which Licensor may from time to time grant to Licensee or to any other person, including without limitation the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which shall in any way modify or amend this guaranty, which shall be continuing and irrevocable during the term of the Agreement, including renewals thereof; and

5.    The arbitration, injunctive relief, governing law, jurisdiction and venue and cost of enforcement provisions contained in Sections 21 and 22 of the Agreement shall govern this Guaranty and such provisions are incorporated into this Guaranty by this reference.

6.    Guarantor(s) agree to be bound by the covenants not to compete and confidentiality provisions set forth in Article 11 of the Agreement.

**IN WITNESS WHEREOF**, each of the undersigned has signed this Guaranty effective as of the date that the Agreement was executed.

GUARANTOR(S)

Curtis O. Barnes, President
390 W. Cerritos Ave.
Anaheim, CA 92805
(866) 477-8222

License Agreement (06/02)
Licensor Initial _____
Licensee Initial _____
Supervising Attorney _____

31

EXHIBIT IV
TO LICENSE AGREEMENT

### ADDENDUM TO COLLECT AMERICA, LTD.
### LICENSE AGREEMENT
### (SUPERVISING ATTORNEY)

1.     The full and complete name and address of the Supervising Attorney, and firm name if applicable, is:

_The Law Office of Curtis O. Barnes, P.C._
Name

_390 W. Cerritos Ave., Anaheim, CA 92805_
Address

_(866) 477-8222_                          _(866) 477-8227_
Telephone Number                          Fax Number

_Cbarnes@locob.com_
E-Mail Address

2.     By execution of this Addendum, Supervising Attorney acknowledges and agrees to the following:

(a)     Supervising Attorney has received a complete copy of the Collect America, Ltd. Uniform Franchise Offering Circular and Exhibits at least ten business days prior to the date of this Addendum.

(b)     Supervising Attorney agrees to comply with the terms and conditions of the Uniform Franchise Offering Circular and the License Agreement, including, but not limited to, Articles 7, 8, 11, 12, 13, 14, 15 and 16 of the License Agreement.

(c)     Supervising Attorney agrees to sign a Software License Agreement.

(d)     Supervising Attorney agrees to attend and complete the next scheduled initial training program of Licensor.

(e)     Supervising Attorney shall maintain a physical office at the Licensee's Business and provide full time on-site supervision and management of the Business on behalf of Licensee.



(f)     All references to Licensee's obligations and requirements, other than ownership, shall apply to the Supervising Attorney.

Dated  March 13, 2003                     **SUPERVISING ATTORNEY**

Curtis O. Barnes, Esq.


**LICENSEE**

**THE LAW OFFICE OF CURTIS O. BARNES, P.C.**

Curtis O. Barnes, President


**COLLECT AMERICA, LTD.**

P. Scott Lowery, CEO

License Agreement (CA)
Licensor Initial _____
Licensee Initial _____
Supervising Attorney Initial _____

33

**EXHIBIT V**
**TO LICENSE AGREEMENT**

**COLLECT AMERICA, LTD.**
**SOFTWARE LICENSE AGREEMENT**

THIS **SOFTWARE LICENSE AGREEMENT** ("Software License Agreement") is made and entered into this 13th day of March, 2003, by and between **COLLECT AMERICA, LTD.,** a Delaware corporation, with its principal offices at 1999 Broadway, Suite 2150, Denver, Colorado 80202 ("Company"), and **THE LAW OFFICE OF CURTIS O. BARNES, P.C.,** whose principal address is 390 W. Cerritos Ave., Anaheim, CA 92805 ("Licensee").

1.    **Background**.    The parties have entered into that certain Collect America License Agreement dated as of even date herewith (the "License Agreement"), under which Company has granted Licensee the right to operate a "Collect America Business" (the "Business"), at the premises identified (or to be identified) in Exhibit I of the License Agreement (the "Licensed Location"). Company is the owner and developer of STARS$^c$, a proprietary computer software program (the "Software") for use in the operation of Collect America Businesses, including any modifications or revisions thereto, all documentation related to the Software, the tangible media upon which such programs are recorded and the database file structure thereof (collectively, the "Software Program"). Licensee desires to obtain a license, and Company desires to grant Licensee a license, to use the Software Program, subject to the terms and conditions hereof. To that end, for good and valuable consideration, the parties agree to the terms and conditions provided below.

2.    **Grant of License and Engagement**.    Subject to the terms and conditions of this Software License Agreement, Company grants to Licensee a nonexclusive, nontransferable, fully paid license to use the Software Program for the term hereof. The parties agree as follows:

(a)    The Software Program shall be installed on the computer equipment designated by Company as meeting its specifications (the "Designated Equipment").

(b)    Except with the prior written consent of Company, the Program shall not be: (i) operated by persons other than Licensee and employees of Licensee; (ii) operated on equipment other than the Designated Equipment; or (iii) operated at locations other than the Licensed Location.

(c)    The Software Program shall be used only to perform debt collection activities on Collect America originated debt ("COAD") placed by Licensor with Licensee in Licensee's operation of the Business and shall not be used to perform debt collection activities for any other person, entity or business.

(d)    Licensee shall not, and shall not allow his employees or agents to: (i) sell, assign, lease, sublicense, market or commercially exploit, in any way, the Software Program, any component thereof or any data generated by the use of the

License Agreement (06/02)
Licensor Initial _____
Licensee Initial _____
Supervising Attorney Initial _____

34

Software Program; (ii) disclose or grant access to the Software Program, any component thereof or any data generated by the use of the Software Program, to any third party other than one whom Company has approved in writing and who has agreed in writing with Company to keep the Software Program confidential; or (iii) copy or reproduce the Software Program, any component thereof or any data generated by the use of the Software Program, in any manner, except for one copy of the Software Program for normal back-up and operations thereof; provided nothing contained herein shall prohibit Licensee from using the data generated by the Software Program to the extent reasonably necessary to comply with local, state and federal law and for usual and customary business purposes.

(e)     Licensee shall keep the Software Program and any data generated by the use of the Software Program confidential during and after the term of this Agreement, and shall establish and maintain such security precautions as are prescribed by Company from time to time to maintain the secrecy of the Software Program and any data generated by the use of the Software Program, and to prevent the unauthorized access to or use, disclosure or copying of the Software Program or any data generated by the use of the Software Program. Company reserves the right to require Licensee to have each of his employees who has access to the Software Program to execute a written confidentiality agreement in a form prescribed or approved in writing by Company. Licensee shall immediately inform the Company in writing if an employee breaches a written confidentiality agreement or otherwise violates the terms and conditions of this Section, or if Licensee learns of any actual or possible unauthorized disclosure of the Software Program or any data generated by the use of the Software Program, such as the loss or theft of any tangible medium (such as a diskette), documentation or other component thereof.

(f)     Licensee acknowledges and agrees that the Software Program and any data generated by the use of the Software Program is the valuable proprietary property and trade secret of Company, and Licensee agrees to use the utmost care to safeguard the Software Program and any data generated by the use of the Software Program and to maintain the secrecy and confidentiality thereof. Licensee shall not undertake to patent, copyright or otherwise assert proprietary rights to the Software Program and any data generated by the use of the Software Program or any portion thereof. Licensee shall not create any derivative works based on the Software without the prior written consent of Company. Licensee recognizes that all or part of the Software Program and any data generated by the use of the Software Program may be copyrighted and agrees that this shall not be construed as causing the copyrighted material to be public information. Licensee shall ensure that any copies of the Software Program and any data generated by the use of the Software Program or any components thereof in its possession contain such copyright notice or other notice of proprietary rights specified by Company. Company retains title and ownership of the Software Program. The grant of this License is not a sale by Company of the Software Program. Licensee agrees that the Software Program and concept of the Software Program is now and shall remain the sole property of Company.



(g)    Licensee shall not modify, adapt, translate, reverse engineer, decompile or disassemble the Software Program in any way without the prior written consent of Company. Company shall have the right to use any ideas and suggestions developed by Licensee for modifications to or enhancements of the Software Program.

(h)    Licensee acknowledges that it has had an adequate opportunity to examine the Software Program and that Licensee is satisfied with the current feature set and that the Software Program performs to its satisfaction, and as represented by Company. Licensee further acknowledges that the unique features of the Software Program, including but not limited to, skip tracing, and the determination of multiple accounts within the system requires the continual compilation of data, on a "read only" basis extracted from all accounts of Licensee utilizing the Software Program.

(i)    Licensee acknowledges and agrees that any violation by Licensee of the provisions of this Section 2 would cause Company irreparable injury for which Company would have no adequate remedy at law and that, in addition to any other remedies which it may have, Company shall be entitled to seek preliminary and permanent injunctive relief against any such violation.

(j)    Upon expiration or termination of this Agreement or the License Agreement, Licensee shall cease further use of the Software Program, allow Company's employees or agents to remove the Software Program from the Designated Equipment, return the Software Program and any data generated by the use of the Software Program (excluding data concerning Licensee's clients) to Company, and destroy any and all back-up or other copies of the Software Program or parts thereof, documentation for the Software Program and any data generated by the use of the Software Program, and other materials or information which relate to or reveal the Software Program and its operation and any data generated by the use of the Software Program, and Company may cease performance of all of its obligations hereunder without liability of Company to Licensee. Notwithstanding the foregoing, if Company allows Licensee to keep accounts in process, as described in Section 10.5 of the License Agreement, Licensee may continue to use the Software Program solely for such purpose until all such accounts have been Worked to Conclusion (as defined in the License Agreement).

(k)    During the term of the License Agreement and, provided that Licensee is in substantial compliance with the terms of this Software License Agreement, Company shall provide Software Program updates to Licensee within a reasonable time after they are announced. Company reserves the right to charge a fee and/or shipping and handling charges to Licensee for such updates effective upon 30 days' prior written notice to Licensee. In the event that Company begins charging a fee for the updates, payment will be due within ten (10) days of Licensee's receipt of the update.

3.    **Term**. Subject to earlier termination in accordance with the terms of this Agreement or the License Agreement, or due to the expiration or termination of the License, the term of this Agreement and the license granted hereunder shall commence on the date of this

License Agreement (06/02) 
Licensor Initial
Licensee Initial
Supervising Attorney In

36

Agreement and shall extend for a period of five (5) years. In the event that Company renews the License Agreement, this Agreement will be renewed for an additional concurrent term.

4. **Warranties**. Company represents and warrants to Licensee that: (a) Company has all rights, titles, licenses and authorizations to license the Software Program to Licensee; and (b) the Software Program does not, and as a result of any updates or revisions the Software Program will not, to the best of Company's knowledge, infringe upon any United States patent, copyright or other proprietary right of any third party. If Licensee's use of the Software Program as provided by Company is enjoined as a result of a claim by a third party of patent or copyright infringement or violation of proprietary rights, then Company shall use its best efforts, in its sole discretion, to either (i) procure for Licensee the right to continue use of the Software Program as contemplated hereunder, or (ii) replace the Software Program or modify it such that there is no infringement of the third party's rights; and such action by Company shall be Company's sole and exclusive obligation to Licensee with respect thereto and Company shall have no further liability to Licensee. The term "best efforts" as used in this Paragraph 4 shall not be construed to include expenditures of money by Company in such event.

Company does not represent or warrant to Licensee, and expressly disclaims any warranty, that the Software Program is error-free or that the operation and use of the Software Program by Licensee will be uninterrupted or error-free. Company shall not have any obligation or liability for any expense or loss incurred by Licensee arising from use of the Software Program in conjunction with any other computer program.

EXCEPT AS PROVIDED ABOVE, COMPANY DOES NOT MAKE ANY WARRANTIES, EXPRESS OR IMPLIED, AND THERE ARE EXPRESSLY EXCLUDED ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

5. **LIMITATION OF LIABILITY**. IN NO EVENT, INCLUDING NEGLIGENCE, SHALL COMPANY, OR ITS OFFICERS, DIRECTORS, EMPLOYEES OR AGENTS HAVE ANY LIABILITY TO LICENSEE HEREUNDER FOR CONSEQUENTIAL, PUNITIVE OR INCIDENTAL DAMAGES OF ANY KIND WHATSOEVER (EVEN IF COMPANY HAS BEEN NOTIFIED OF THE POSSIBILITY OF SUCH DAMAGES). BECAUSE SOME STATES DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, THE ABOVE LIMITATIONS MAY NOT APPLY TO LICENSEE. HOWEVER, IN NO EVENT SHALL COMPANY'S TOTAL LIABILITY HEREUNDER FOR ALL DAMAGES, LOSSES, AND CAUSES OF ACTION (WHETHER IN CONTRACT, TORT OR OTHERWISE) EXCEED $500.00.

6. **Indemnification**. Licensee hereby agrees to indemnify and hold Company and its shareholders, officers, directors, employees and agents (collectively, the "Indemnified Parties") harmless from and against any and all loss, cost, damage, liability and expense (including without limitation reasonable attorneys' fees, court costs and other reasonable costs and expenses) which may be suffered, sustained or incurred by any one or more of the Indemnified Parties as a result of, arising out of, or in connection with (a) Licensee's breach of



any its obligations hereunder, and (b) any and all negligent acts or omissions of Licensee, or any of its owners, officers, directors, employees or agents.

7.    **Transfer by Licensee**.   Licensee may transfer Licensee's rights under this Software License Agreement only to a transferee approved by Company and only in conjunction with a transfer of the License Agreement.

8.    **Termination**.   The license granted to Licensee hereunder and this Software License Agreement shall terminate immediately upon the occurrence of any of the following events:

       (a)    immediately upon delivery to Licensee of written notice of termination if Licensee has violated any provision of this Software License Agreement; or

       (b)    immediately and without notice if Licensee (or a transferee of the License Agreement approved by Company) ceases to have the right to operate the Business pursuant to the License Agreement; or

       (c)    immediately and without notice if Licensee shall sell, assign or transfer, directly or indirectly, (i) Licensee's rights under this Software License Agreement, (ii) a controlling interest in the ownership of Licensee, or (iii) substantially all of the assets of the Business; if such sale, assignment or transfer has not been approved in writing by Company and made in conjunction with the transfer of the License Agreement. "Controlling interest" shall mean 50% or more of the equity or voting control of Licensee or a change in Supervising Attorney.

Immediately upon the termination of this Software License Agreement and the license granted herein, all rights granted to Licensee hereunder shall revert to Company, and Licensee shall be deemed to have assigned, transferred or conveyed to Company any and all equities or other rights of the Licensee under this Software License Agreement.  The obligations of Licensee under subsections (b) through (j) of Section 2 shall survive the termination of this Software License Agreement.

9.    **Enforcement**.   The terms of Section 22 of the License Agreement are incorporated herein and made a part hereof by this reference.

**IN WITNESS WHEREOF**, the parties have signed this Software License Agreement on the date first above written.

COLLECT AMERICA, LTD.          THE LAW OFFICE OF CURTIS O. BARNES, P.C.

_____    _____
P. Scott Lowery, CEO             Curtis O. Barnes, President

**EXHIBIT VI**
**TO LICENSE AGREEMENT**

**CONTINGENCY FEE AGREEMENT**

This Contingency Fee Agreement ("CFA") is made between the Licensee named in the Collect America, Ltd. License Agreement, and the Supervising Attorney and law firm designated by Licensee pursuant to the terms of the Licensee Agreement (all collectively referred to as "Firm"), and Collect America, Ltd. for itself, its subsidiaries, affiliates, lenders, successors and assigns (collectively, "Client"), whose address is as shown therein.

Client has requested Firm provide services for the collection of debt ("Accounts") owing by persons ("Account Debtors") to Client. For the purposes of this CFA, "Client" includes any assignor or secured party of Client.

THEREFORE, CLIENT AND FIRM AGREE AS FOLLOWS:

**1.0     CONTINGENT FEES:**

The fees of Firm shall be contingent and Firm shall be entitled to the agreed-upon percentage of moneys paid in good funds by an Account Debtor and applied in accordance with Paragraph 5 hereof, whether paid by the Account Debtor to the office of Firm, paid to Client, paid to Client's assignor or paid to any source entitling Client to a fee and without regard to the manner of payment, at any time after the Account of the Account Debtor is placed with Firm, providing always that the Account on which payment is made has not been withdrawn from Firm in accordance with the terms hereof.

The Contingency Fee to be earned by Firm shall be that percentage offered by Client to Firm. For each Account placed with Firm by Client, Client shall clearly indicate the Contingency Fee that may be earned by Firm.

**2.0     COSTS, LEGAL PROCEEDINGS:**

No court costs or other costs, incidental to court proceedings or otherwise, shall be advanced by Firm without the specific written permission of Client.

No legal proceedings, including arbitration, shall be brought or instituted by Firm on any Debtor Account placed with Firm by Client unless and until Firm shall have obtained the specific permission of Client which permission shall be either in a writing or given electronically through the use of STARS$^{\circledR}$. Client will pay, in advance, court costs for any Debtor Account on which legal proceedings have been authorized as provided for herein. Client shall have no liability for any costs excepting those authorized as herein provided.



**3.0   TRUST ACCOUNT WHEN REQUIRED BY STATE IN WHICH FIRM OPERATES:**

If Firm is located in a state that requires Firm to maintain a trust account for its clients, then all of the terms and provisions of this Section 3 shall apply, to wit:

Upon the execution of this CFA and prior to Client placing Debtor Accounts with Firm for collection, Client shall establish a Trust Account (CATA) in a National Bank, if practicable. The CATA shall be for the sole purpose of the deposit by Firm of all moneys received on any and all Debtor Accounts placed by Client with Firm for collection (CAOD). Firm shall designate Client through its authorized agent, to be an authorized signatory on such trust account.

Firm shall promptly, and to the extent possible each business day, deposit in the CATA all moneys received by Firm on **CAOD**. Firm acknowledges that Client, as an authorized signatory, will withdraw funds from the CATA when and as necessary to comply with the contractual obligations of Client.

Client hereby expressly gives Firm the authority to accept moneys paid on any **CAOD** whether said moneys are paid to the order of Firm or Client, and Client gives Firm the express authority to endorse, as necessary, any such moneys, for deposit only, to the CATA.

**4.0   PROCEDURE FOR REMITTANCE OF FUNDS COLLECTED ON CAOD BY FIRM WHEN CLIENT TRUST ACCOUNT NOT REQUIRED BY STATE IN WHICH FIRM OPERATES:**

Firm shall, not later than at Firm's close of business each day, send to Client, by one day overnight mail, all moneys received by Firm on **CAOD**.

All checks received by Firm on **CAOD** payable to Firm shall be endorsed by Firm "Pay To Collect America, Ltd." and Firm shall thereupon timely send all such checks to Client within the time and by the manner set forth above.

All cash payments received by Firm on **CAOD** shall be deposited by Firm to its trust account on the day of receipt by Firm and thereupon Firm shall draw its check payable to Client for the amount of such deposit and shall thereupon send such check to Client within the time and by the manner set forth above.

When Firm accepts a payment on **CAOD** made by use of what is commonly known as "Western Union Quick Collect" Firm shall use the Client Assigned code number.

When Firm accepts a payment on **CAOD** made by use of what is commonly known as, by way of example, and not limitation, "Check by Phone" Firm shall only accept, use and enter such payment by using STARS[©] whereafter Client, using "Check by Phone" or such other similar method of payment, shall draw the check for payment on the **CAOD**.

License Agreement (06/02)
Licensor Initial
Licensee Initial
Supervising Attorney Initial

40

When Firm accepts a payment on **CAOD** to the Firm trust account made by use of a "Credit Card" Firm shall on the day such payment is made, enclose in its overnight mailing to Client a copy of the form used by Firm to accept and acquire such payment. Client will bill Firm for each such payment deducting therefrom any Contingent Fee due Firm. Client shall not pay nor shall Firm attempt to charge Client for any fee accruing by use of a "Credit Card."

Notwithstanding the above, Firm shall follow and be bound by the operational policies established by Client and furnished to Firm, as may be revised from time to time.

**5.0    ACCOUNTING FOR FEES, METHOD AND DATES:**

All Contingent Fees due Firm for moneys collected by Firm on Debtor Accounts placed with Firm by Client shall be remitted to Firm by Client in accordance with the following schedule:

| Date of Remittance | Contingent Fees Due Firm On Moneys Collected For The Period |
|---|---|
| 5th day @ month | From the 16th through the last day of the previous month |
| 20th day @ month | From the 1st day through the 15th day of the instant month |

Client may charge Firm a fee for each payment made, other than by cash funds, by an Account Debtor returned, not paid. Client may revise the remittance schedule upon sixty-days (60) notice to Firm. In no event will the frequency of remittance be less frequent than as shown in the schedule above.

**6.0    PLACEMENT AMOUNT, ACCRUING INTEREST, ATTORNEY FEES:**

For the purposes of this CFA, "Placement Amount" shall mean that amount of a debt, expressed as a sum of money, which is the total amount of money owing on an Account by an Account Debtor as of the time the account of an Account Debtor is placed by Client with Firm for collection.

"Placement Amount" does not include (i) interest accruing after placement ("accruing interest") or (ii) attorney fees awarded after placement or (iii) costs expended after placement. By way of illustration and not limitation, "Placement Amount" may include the principal amount, any interest due to the date of placement, any attorney fees awarded and due as of the placement date, any costs awarded and due as of the placement date when a judgment is placed for collection (**CAOD**) with Firm by Client.

Firm and Client agree that all moneys received for application to the account of an Account Debtor will be characterized and applied to such Debtor Account in the following order of priority for the purpose of determining when Firm is entitled to a Contingency Fee on such moneys and Firm shall be entitled to a Contingency Fee only on moneys applied to the Second and Third Priority, to wit:

License Agreement (06/02)
Licensor Initial _____
Licensee Initial _____
Supervising Attorney _____ 

41

| FIRST PRIORITY: | Any costs advanced or paid by Client |
| SECOND PRIORITY: | Placement Amount |
| THIRD PRIORITY: | Additional accruing interest |
| FOURTH PRIORITY: | Attorney Fees, if any, awarded to Firm, 100% of which shall be paid Firm |
| FIFTH PRIORITY | Other fees, if any |

In some cases Firm may be awarded attorney fees and in the case of such an award, Firm shall be entitled to 100% of such awarded fees.

## 7.0   PLACEMENT OF ACCOUNTS:

Client may offer to Firm for the purpose of collection Accounts owing to Client, using the form attached hereto as Schedule A, reserving to Client the right to amend, as necessary Schedule A to comply with contractual obligations of Client.

Client warrants it has authority to offer Firm such Accounts as may be offered from time to time to Firm by Client.  Any placement of Accounts with Firm shall be for the time limits shown on Schedule A.

Any Accounts placed with Firm by Client may be recalled at anytime except those Accounts "in the process of collection" as that term is defined hereinafter.

Firm and Client agree that "in the process of collection" shall mean, unless stated otherwise in Schedule A,: (i) any account in the hands of Firm for less than ninety (90) days, (ii) any account on which payment is being made, (iii) any account on which a payment has been made in the last forty-five (45) days, (iv) any account on which payment(s) is promised within the next forty-five (45) days, (v) any account on which suit has been brought, (vi) any account on which judgment has been obtained and there has been a payment made and/or a payment plan entered into which plan is being continuously performed within and during the six (6) months immediately following the date judgment entered.

Notwithstanding the foregoing, Firm agrees Client may recall any account on which an assignor or secured party of Client has, within the terms of the agreement between such assignor or secured party and Client, recalled such account from Client.

Firm shall renew or review, as necessary, any judgment retained by Firm as being in the process of collection.

## 8.0   WAIVER OF CLAIM BY FIRM FOR FEES OR OTHER SUMS ON RECALLED ACCOUNTS:

Client shall have no liability to Firm for any sum of money claimed due Firm by Client as a result of moneys paid by an Account Debtor, regardless of place of payment, when:



License Agreement (06/02)
Licensor Initial _____
Licensee Initial _____
Supervising Attorney Initial _____

1. The account of such Account Debtor has been recalled from Firm by Client, or
2. The account of such Account Debtor has been returned by Firm to Client, or
3. The Firm has closed and returned to Client such account.

Firm does hereby waive against Client or assignor of Client any claim for fees, contingent or otherwise, of any kind or nature whatsoever, no matter how designated, including, but not limited to, quantum meruit, for services rendered on any Debtor Account recalled from Firm by Client.

**9.0    ARBITRATION:**

Arbitration of any dispute hereunder shall be in accordance with the provisions for arbitration contained in Paragraph 21.0 of the Collect America, Ltd. License Agreement to which this CFA is attached and made part thereof.

**10.0    ENTIRE AGREEMENT, MODIFICATION, CAPTIONS, EXECUTION:**

This CFA, Schedule A, as each may be amended from time to time, and the Collect America, Ltd. Licensee Agreement to which this CFA and Schedule A are attached, made part of, and incorporated therein, constitute the full and entire agreement regarding Client's placement of Accounts with Firm for collection, and no other document shall be construed as determinative of the intent of the parties relative to this CFA, unless mutually agreed to in writing by the parties to this CFA.

Excepting as provided for herein, this CFA may not be modified except by written agreement signed by Firm and Client.

The captions appearing in this CFA are for the purpose of reference and convenience only and shall not define, limit, or describe the scope and/or intent of this CFA or any provision thereof.

The invalidity of any portion of this CFA shall not be deemed to affect the validity of any other provision. In the event that any provision of this CFA is invalid, the remaining provisions shall be deemed to be in full force and affect as if both parties subsequent to expungement of the invalid provisions had executed them.

This CFA shall be governed by and construed in accordance with the laws of the state of Colorado, and all legal proceedings pertaining to the enforcement of this CFA, or arbitration of a dispute arising from this CFA, shall be brought in the state of Colorado. Firm irrevocably submits to the jurisdiction of any state or federal court of general jurisdiction in the state of Colorado and waives any objection it may have either to the jurisdiction of or venue in such courts.

This CFA shall become effective on the date it has been fully executed by Firm and Client.

IN WITNESS WHEREOF, Client and Firm have executed this CFA on this 13th day of March, 2003.

**LICENSOR:**

COLLECT AMERICA, LTD.

By: _____
    P. Scott Lowery, CEO

**LICENSEE:**

THE LAW OFFICE OF CURTIS O. BARNES, P.C.

By: _____
    Curtis O. Barnes, President

License Agreement (06/02)
Licensor Initial _____
Licensee Initial _____
Supervising Attorney _____

44

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement (the "Agreement") is made and entered into effective the 13th of March, 2003, by and between COLLECT AMERICA, LTD., a Delaware corporation ("Company"), located at 1999 Broadway, Suite 2150, Denver, Colorado 80202 and THE LAW OFFICE OF CURTIS O. BARNES, P.C., ("Associate"), who resides or maintains a principal place of business at 390 W. Cerritos Ave, Anaheim, CA 92805.

## RECITALS

A.  The Company is engaged in the business of selling licenses for the operation of businesses, which provide collection services operating under the name and service mark **"COLLECT AMERICA®"("COLLECT AMERICA Business");**

B.  The Company using its service mark and related design, and other trademarks, service marks and trade names specifically associated with the Company ("Marks"), has developed, owns and controls a distinctive system to market and service debt collection activities ("System") through COLLECT AMERICA Businesses which provide collection services via a centralized computer system and communications network ("Network") utilizing the proprietary software of Company ("Software") and the Company's Mark.  The term System is further defined in this Agreement to include, without limitation, all proprietary information concerning the Company's business and the COLLECT AMERICA Businesses; sales methods; reports (electronic or printed); training techniques; all marketing research data and marketing plans; all information contained in the Company's O&T Manual, and any other manual or nonpublic written information about the Company, all of which constitute trade secrets of the Company, and Associate acknowledges that the Company has valuable rights in and to such trade secrets.  The Marks, System, Network, and Software of the Company are all collectively referred to as "Confidential Information" and such Confidential Information may be further developed from time to time by the Company ;

C.  The Company has established substantial goodwill and an excellent reputation with respect to the quality of services available, which goodwill and reputation have been and will continue to be of major benefit to the Company;

D.  Associate is or will become involved with the Company in the capacity of an officer, partner, director, agent, employee, beneficial owner, or as a Licensee or Supervising Attorney, as those terms are defined in the Collect America Licensee Agreement, of the COLLECT AMERICA Business, and will become privileged as to certain Confidential Information; and

E.  Associate and the Company have reached an understanding with regard to nondisclosure by Associate of Confidential Information.

**NOW THEREFORE,** in consideration of the foregoing, the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Associate and the Company, intending legally to be bound, agree as follows:

1.  **Confidential Information.**  Associate and the Company acknowledge that the techniques, operating procedures, marketing systems and processes of the Company described in paragraph B of this Agreement, referenced as Confidential Information in paragraph B of this Agreement, and utilized in

License Agreement (06/02)
Licensor Initial ___
Licensee Initial ___
Supervising Attorney Initial ___

45

connection with the operation of the COLLECT AMERICA Business are the Company's Confidential Information. Such Confidential Information is unique, exclusive property and a trade secret of the Company. Associate acknowledges that any unauthorized disclosure or use of the Confidential Information would be wrongful and would cause irreparable injury and harm to the Company. Associate further acknowledges that the Company has expended a great amount of effort and money in obtaining and developing the Confidential Information, that the Company has taken numerous precautions to guard the secrecy of the Confidential Information and that it would be very costly for competitors to acquire or duplicate the Confidential Information.

2. **Client Lists and Operations and Training Manual as Trade Secrets.** It is understood that Confidential Information, constituting "trade secrets", as used in this Agreement is deemed to include, without limitation, lists of clients, and any and all information contained in the COLLECT AMERICA Operations and Training Manual, which may be provided as one or more separate manuals, or written instructional guides, as the same are changed or supplemented from time to time, and any information of whatever nature which gives the Company an opportunity to obtain an advantage over its competitors who do not have access to, know or use such lists, written materials or information.

3. **Nondisclosure of Confidential Information.** Associate shall not at any time, publish, disclose, divulge or in any manner communicate to any person, firm, corporation, association, partnership or any other entity whatsoever or use, directly or indirectly, for its own benefit or for the benefit of any person, firm, corporation or other entity other than for the use of the Company or the COLLECT AMERICA Business, any of the Confidential Information of the Company.

4. **Injunction.** Associate hereby acknowledges and agrees that in the event of any breach or threatened breach of this Agreement, the Company shall be authorized and entitled to seek, from any court of competent jurisdiction, preliminary and permanent injunctive relief in addition to any other rights or remedies to which the Company may be entitled.

5. **Effect of Waiver.** The waiver by Associate or the Company of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach thereof.

6. **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Associate and the Company and their respective heirs, executors, representatives, successors and assigns.

7. **Entire Agreement.** This instrument contains the entire agreement of Associate and the Company relating to the matters set forth herein. It may not be changed orally, but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification, extension or discharge is sought.

8. **Governing Law.** This instrument shall be governed by and construed under the laws of the state of Colorado.

9. **Jurisdiction and Venue.** In the event of a breach or threatened breach by Associate of this Agreement, Associate hereby irrevocably submits to the jurisdiction of the District Court of the state of Colorado and the Federal District Court for the District of Colorado, and irrevocably agrees that venue for any action or proceeding shall be in the City and County of Denver, Colorado. Both parties waive any objection to the jurisdiction of these courts or to venue in Denver, Colorado. Notwithstanding the foregoing, in the event that the laws of the state where the Associate resides prohibit the aforesaid designation of jurisdiction and venue, then such other state's laws shall control.



**10.  Severability.**  If any provision of this Agreement shall be held, declared or pronounced void, voidable, invalid, unenforceable or inoperative for any reason, by any court of competent jurisdiction, government authority or otherwise, such holding, declaration or pronouncement shall not affect adversely any other provisions of this Agreement which shall otherwise remain in full force and effect.

**11.  Attorneys' Fees.**  In any action at law or in equity to enforce any of the provisions or rights under this Agreement, the unsuccessful party in such litigation, as determined by the court in a final judgment or decree, shall pay the successful party or parties all costs, expenses and reasonable attorneys' fees incurred therein by such party or parties (including without limitation such costs, expenses and fees on any appeals), and if such successful party shall recover judgment in any such action or proceeding, such costs, expenses and attorneys' fees shall be included as part of such judgment.

**IN WITNESS WHEREOF,** the parties have signed this Agreement on the date first above written.

COLLECT AMERICA, LTD.

By: _____
    P. Scott Lowery, CEO

THE LAW OFFICE OF CURTIS O. BARNES, P.C.

By: _____
    Curtis O. Barnes, President

License Agreement (06/02)
Licensor Initial _____
Licensee Initial _____
Supervising Attorney Initial _____

47

EXHIBIT G
TO OFFERING CIRCULAR

COLLECT AMERICA, LTD.
DISCLOSURE ACKNOWLEDGEMENT

## DISCLOSURE ACKNOWLEDGEMENT

In order to make sure that no misunderstanding exists between The Law Office of Curtis O. Barnes, P.C.("Licensee") and Collect America, Ltd., and to make sure that no violations of law might have occurred, and understanding that Collect America, Ltd. is relying on the statements made in this document, Licensee assures Collect America, Ltd. as follows:

A.     The following dates are true and correct:

<u>Date</u>                                                                                      <u>Initials</u>

1._____, 20___                      _____The date on which I received a COLLECT AMERICA Uniform Franchise Offering Circular.

2._____, 20___                      _____The date of my first face-to-face meeting with a representative of Collect America, Ltd. to discuss the possible purchase of a COLLECT AMERICA license.

3._____, 20___    _____The date on which I received a completed copy (other than signatures) of the License Agreement which I later signed.

4._____, 20___                      _____The date on which I signed the License Agreement.

5._____, 20___                      _____The earliest date on which I delivered cash, check, or other consideration to the representative of Collect America, Ltd.

B.     Representations:

1.     No oral, written, visual or other promises, agreements, commitments, representations, understandings, side agreements, options, rights-of-first refusal or otherwise have been made to or with me with respect to any matter (including marketing, operational or administrative assistance, exclusive rights or territory); nor have I relied in any way on any such representations, except as expressly set forth in the License Agreement, and except as follows:

_____NONE_____

(If none, you should write NONE above and initial)

2.     No oral, written, visual or other claim or representation (including but not limited to charts, tables, spreadsheets or mathematical calculations to demonstrate actual or possible results based on a combination of variables, such as multiples of price and quantity to reflect gross sales or otherwise) which stated or suggested a specific level or range of actual or potential sales, costs, income, expenses, profits, cash flow, tax effects or otherwise, was made to me by any

representative of Collect America, Ltd., nor have I relied in any way on any such representation, except as follows:

_____ NONE _____

(If none, you should write NONE above and initial)

     3.    Collect America, Ltd. has not made to me any oral, written, visual or other claim or representation with respect to the referral of business, accounts or debt to me, except as follows:

_____ NONE _____

(If none, you should write NONE above and initial)

     4.    I have had an opportunity to consult with an independent professional advisor, such as an attorney or accountant, prior to signing the License Agreement and paying any sums, and Collect America, Ltd. strongly recommended that I obtain such independent advice.

     5.    I understand that entry into any business venture necessarily involves some unavoidable risk of loss or failure, that the purchase of a COLLECT AMERICA license is a speculative investment, that there exists no guaranty against possible loss or failure in this or any other business, and that the most important factor in the success of my COLLECT AMERICA business, is my own personal business, marketing and management skills.

The individuals signing below constitute all of the shareholders, partners, investors and/or principals of the licensed business. Each of these individuals has reviewed the Uniform Franchise Offering Circular and all exhibits, including the License Agreement.

IF THERE ARE ANY MATTERS INCONSISTENT WITH THIS STATEMENT OR IF ANYONE HAS SUGGESTED THAT THIS DOCUMENT BE SIGNED WITHOUT ALL OF THE STATEMENTS BEING TRUE, CORRECT AND ACCURATE, IMMEDIATELY INFORM THE PRESIDENT OF COLLECT AMERICA, LTD. AT 303-296-3345.

I understand and agree to all of the foregoing and represent and warrant that all of the above statements are true, correct and complete.

Dated: March 13, 2003

_____
Curtis O. Barnes, President

**ADDENDUM**
**COLLECT AMERICA, LTD.**
**LICENSE AGREEMENT**

This Addendum ("Addendum") shall modify that certain License Agreement by and between Collect America, Ltd. ("Licensor") and the Law Offices of Curtis O. Barnes, P.C. ("Licensee"), dated as of the 13th day of March, 2003 ("License Agreement"), as set forth below:

1.      Licensee may purchase "fresh" credit card debt from any entity not listed on Exhibit "A" without the consent of Licensor.  For the purposes of this Addendum, "fresh" credit card debt is defined as credit card debt sold immediately after charge-off that has not been placed with any outside agency or other party after charge-off.

2.      Licensee may collect contingency debt for any entity not listed on Exhibit "B".

3.      Licensee may use its own collection system for collection of non-CAOD debt.

4.      In addition to the indemnification clause set forth in Item 15.2 of the License Agreement, the following indemnification clause shall apply:

        Licensor hereby indemnifies and holds Licensee, its officers, directors, employees, agents and representatives harmless from any and all liability, loss or damage Licensee may suffer as the result of claims, demands, costs or judgments against Licensee arising out of Licensor's operation of the Collect America Business, or the relationship of the parties under this Agreement, or arising out of the use of the Program in any manner not in accordance with this Agreement, whether the liability, loss or damage is caused by or arises out of any act of Licensor or Licensor's officers, employees, agents or otherwise.  This indemnity shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

5.      Section 12.2 of the License Agreement shall be modified to provide for a renewal fee of $500.00 (Five Hundred dollars).  All other terms of Section 12.2 of the License Agreement shall remain the same.

6.      The confidentiality provisions of the License Agreement shall extend to the terms of this Addendum.

This Addendum shall terminate upon the expiration of the License Agreement and must be separately negotiated upon any renewal of the License Agreement.

LICENSOR

COLLECT AMERICA, LTD.

By: _____
P. Scott Lowery, CEO and President

LICENSEE

LAW OFFICES OF CURTIS O. BARNES

By: _____
Curtis O. Barnes

Date: Effective as March 13, 2003

**Exhibit A**

1. Granite Funding
2. First Bank
3. Wells Fargo
4. First Merchant Acceptance Corp
5. Saks Fifth Ave.
6. First Union
7. Nations Bank
8. First Interstate Bank
9. Mercantile Bank
10. Bank One
11. First USA Bank
12. Chevy Chase
13. Chase Manhattan Bank
14. First Chicago
15. GE Capital
16. US Bank/First Star
17. Associate Bank
18. MBNA
19. Bank of America
20. Discover Card
21. Household Bank
22. FNANB
23. Compucredit
24. Metris Bank
25. Fleet Bank
26. First Select
27. Atlantic Credit
28. Worldwide Asset
29. Home Commings
30. Outsourcing Solutions, Inc.